# United States District Court
## District of New Mexico

CALVARY ALBUQUERQUE, INC.,
STEFAN DAVID GRANT GREEN,
KEILAH ANNA GREEN, *and*
H.P.G., *a minor,*

               *Plaintiffs,*

       *v.*

ANTHONY BLINKEN, *U.S. Secretary of State,* U.S. DEPARTMENT OF STATE, OFFICE OF THE LEGAL ADVISER FOR CONSULAR AFFAIRS, U.S. CONSULATE JOHANNESBURG, U.S. CONSULATE CAPE TOWN, *and* UNKNOWN CONSULAR OFFICER,

          *Defendants.*

No. 1:23-cv-00486-KWR-KK

## DEFENDANTS' RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS (OPPOSED)

Alexander M.M. Uballez
  *United States Attorney*

Benjamin G. Minegar
  *Assistant United States Attorney*
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274
benjamin.minegar@usdoj.gov

Plaintiffs Calvary Albuquerque, Inc., Stefan Green, Keilah Green, and H.P.G. contend that a host of federal defendants violated their rights to religious freedom by refusing Mr. Green — a worship pastor from South Africa — an R-1 visa to visit the United States and work at Calvary's church. *See* Doc. 1. Plaintiffs' claims, however, fail for jurisdictional reasons and on the merits, and they should be dismissed under Rules 12(b)(1) and 12(b)(6).

At the threshold, plaintiffs lack Article III standing. *First*, consular officers denied Mr. Green's R-1 visa on two distinct grounds — a misrepresentation and a failure to show that Mr. Green would leave the U.S. after his visa expired — yet plaintiffs challenge only the misrepresentation ground. Mr. Green would thus remain ineligible for a visa even with a favorable judgment, meaning plaintiffs lack standing. *Second*, in any event, because consular officers have exclusive authority to adjudicate visa applications, plaintiffs lack standing to sue each defendant in this case other than "Unknown Consular Officer."

Plaintiffs' claims also lack merit. *First*, their claims fail under the settled doctrine of consular nonreviewability, grounded in the Constitution's separation of powers, as consular officers provided facially legitimate and bona fide reasons for refusing Mr. Green's R-1 visa. *Second*, their claims are inviable because plaintiffs fail to show a substantial burden on their religious exercise, much less one that overrides the government's compelling interest in combatting misrepresentations made during the visa process here.

This case should be dismissed.[*]

## BACKGROUND

### A. The visa process

**1.** With limited exceptions, noncitizens may not be admitted to the United States without an immigrant or nonimmigrant visa. *See* 8 U.S.C. §§ 1181(a), 1182(a)(7); 8 C.F.R. § 214.1(a)(3)(i); *Kerry v. Din*, 576 U.S. 86, 89 (2015) (plurality opinion). A visa is "permission" for a foreign national to "approach the borders of the United States and ask to enter." *Amiri v. Kelly*, 2018 WL 623652, at \*2 (E.D. Mich. 2018). Authority to issue or refuse visas, based on requirements set by the Immigration and Nationality Act (INA), rests exclusively with State Department consular officers, typically in U.S. Consulates in foreign countries. *See* 8 U.S.C. §§ 1104(a), 1201(a)(1), 1201(g); 22 C.F.R. §§ 40.201, 41.101(a), 41.111, 42.71(a).

The "burden of proof is upon the applicant to establish eligibility to receive a visa" before a consular officer. 22 C.F.R. § 40.6; *see also* 8 U.S.C. § 1361; 22 C.F.R. § 41.11(a). Honesty during the application process is required: Visa applicants "shall provide complete and accurate information" about the "purpose" of their "intended stay," 8 U.S.C. § 1202(c), "verified" by "oath," *id.* § 1202(e), and "under penalty of perjury," 22 C.F.R. § 41.103(b); *see also* 8 C.F.R. § 214.1(f) ("full and truthful disclosure" required). To that end, visa applicants must appear before consular officers for in-person interviews concerning their

---

[*]Plaintiffs confirmed that they oppose this motion. *See* D.N.M.LR-Civ. 7.1(a).

applications so that consular officers can assess their credibility face to face. *See* 8 U.S.C. § 1202(h); 22 C.F.R. § 41.103(b).

"No visa … shall be issued" if "it appears to the consular officer," or if the "consular officer knows or has reason to believe," that a noncitizen is "ineligible to receive a visa" under 8 U.S.C. § 1182 "or any other provision of law." 8 U.S.C. § 1201(g). For example, noncitizens are ineligible for visas if they, "by fraud or willfully misrepresenting a material fact, seek[] to procure (or ha[ve] sought to procure or ha[ve] procured) a visa." *Id.* § 1182(a)(6)(C)(i). Likewise, noncitizens are ineligible for nonimmigrant visas if they "fail[] to overcome the presumption of immigrant status" set by 8 U.S.C. § 1184(b) by showing that they will leave the U.S. when their visas expire. 22 C.F.R. § 41.11.

**2.** Two nonimmigrant visas are relevant here: B-1/B-2 visas and R-1 visas.

Under a B-1/B-2 visa, a noncitizen with "a residence in a foreign country" and "no intention of abandoning" it may visit the U.S. temporarily for business (typically tied to foreign employment) and pleasure. 8 U.S.C. §§ 1101(a)(15)(B), 1184; *see* 22 C.F.R. § 41.31. The term "business" is limited: It "does not include local employment or labor for hire" in the U.S., 22 C.F.R. § 41.31(b)(1), nor may B-1/B-2 visa-holders "engage in any [U.S.-based] employment" or contract work without prior "permission" or a change in visa status permitting employment, 8 C.F.R. § 214.1(e); *see* 22 C.F.R. § 41.31(b)(1) (prerequisites for noncitizens "seeking to enter … for employment or labor pursuant to a contract").

Under an R-1 nonimmigrant visa, noncitizen religious workers may be

admitted to the U.S. if they have "been a member of a religious denomination having a bona fide nonprofit, religious organization" in the U.S. for two years before petitioning and they seek to enter the U.S. "for a period not to exceed 5 years to perform" religious work for the organization. 8 U.S.C. § 1101(a)(15)(R); 8 C.F.R. § 214.2(r); *Iglesia Pentecostal v. Duke*, 718 F. App'x 646, 648 (10th Cir. 2017). Religious organizations initially petition to U.S. Citizenship and Immigration Services (USCIS), part of the Department of Homeland Security (DHS), to classify the noncitizen whom they seek to employ as a nonimmigrant religious worker (Form I-129). *See* 8 C.F.R. § 214.2(r)(1)(iv), 214(r)(7)–(8); USCIS Policy Manual, Vol. 2, Part O, Ch. 2 (2023), uscis.gov/policy-manual/volume-2-part-o-chapter-2.

But an R-1 petition approved by USCIS is "not a visa and will not permit the [noncitizen] to enter the United States." *Liberty Church v. Pompeo*, 470 F. Supp. 3d 74, 76 (D. Mass. 2020); *see* 22 C.F.R. § 41.58(b) ("The approval of a petition by USCIS does not establish that the alien is eligible to receive a nonimmigrant [R-1] visa"). Nor does a USCIS-approved petition "guarantee the grant" of an R-1 visa, as a "consular officer must independently determine that an applicant has met the requirements for R status." *Liberty Church*, 470 F. Supp. 3d at 81 n.7; *see R-1 Nonimmigrant Religious Workers*, USCIS (2023), uscis.gov/working-in-the-united-states/temporary-workers/r-1-nonimmigrant-religious-workers ("After we approve your petition, the consular post determines whether you are eligible to receive the R-1 nonimmigrant visa").

— 4 —

**B. Mr. Green's R-1 visa refusals**

**1.**   Mr. Green, Mrs. Green, and their son H.P.G. are South African citizens. *See* Doc. 1 ¶¶ 20–22. On April 9, 2022, they traveled to the U.S. on B-1/B-2 visitor visas limited to "business" and "pleasure," as defined by federal law. *See id.* ¶ 45; 22 C.F.R. § 41.31(b)(1) (prohibiting U.S.-based contract work under a B-1/B-2 visa without permission or change in visa status).

**2.**   On April 25, 2022, about two weeks after the Greens arrived in the U.S. on B-1/B-2 visas, Calvary petitioned USCIS to classify Mr. Green as a nonimmigrant religious worker, and four months later, on August 29, 2022, USCIS approved the petition. *Id.*; *see Liberty Church*, 470 F. Supp. 3d at 76 ("[A]n approved [R-1] petition" from USCIS "is not a visa"). During that four-month time frame, however, Mr. Green worked as a paid "independent contractor" at Calvary, a large Christian church in Albuquerque with thousands of members, while visiting on only a B-1/B-2 visa and without permission or change in visa status permitting such employment. Doc. 1-2 at 1–2; *see* Doc. 1 ¶ 8.

**3.**   Mr. Green later twice applied for an R-1 visa before State Department consular officers, but both applications were refused.

First, after returning to South Africa, Mr. Green appeared at the U.S. Consulate in Cape Town, South Africa, on November 14, 2022 and submitted his first application for an R-1 visa to enter the U.S., this time as a religious worker for Calvary. Doc. 1 ¶ 51 (incorrectly listing the date as November 17, 2022). After reviewing the application and interviewing Mr. Green in person, the consular officer refused the R-1 visa and revoked Mr. Green's B-1/B-2 visa, Doc. 1

¶ 51, finding that Mr. Green "fail[ed] to overcome the presumption of immigrant status" set by 8 U.S.C. § 1184(b). 22 C.F.R. § 41.11. In other words, Mr. Green was "unable to establish to the satisfaction of the consular officer that he would depart" the U.S. after the R-1 visa expired. Doc. 1-2 at 2.

Mr. Green submitted additional requested documents and applied for an R-1 visa again, this time appearing at the U.S. Consulate in Johannesburg, South Africa and sitting for two in-person interviews before a consular officer, on December 14, 2022 and January 19, 2023. Doc. 1 ¶ 52. The consular officer again refused the R-1 visa, finding that Mr. Green "misrepresented his purpose of travel as one commensurate with a B-1/B-2 visa" in April 2022 "when in fact, he intended to engage in unauthorized employment for hire while in the United States, as an independent contractor" at Calvary, a misrepresentation under 8 U.S.C. § 1182(a)(6)(C)(i) rendering him ineligible for a visa. Doc. 1-2 at 1–2.

**4.** Later, on March 30, 2023, Mr. Green sought an advisory opinion about his visa refusals through "LegalNet" from the Office of the Legal Adviser for Consular Affairs, which responded by email on April 13, 2023. *Id.* The email "confirm[ed] that a consular officer refused [Mr. Green's] R-1 visa application" under two distinct INA provisions: § 1182(a)(6)(C)(i) for a misrepresentation and § 1184(b) for failure to overcome the presumption of immigrant status. *Id.*

## C.  This lawsuit

Fifty-three days later, on June 5, 2023, plaintiffs filed this lawsuit, naming multiple federal defendants and challenging the consular officers' decisions to refuse Mr. Green's R-1 visa applications under the Religious Freedom

Restoration Act (RFRA), Administrative Procedure Act (APA), and Declaratory Judgment Act (DJA). *See* Doc. 1 ¶¶ 66–76.

On the same day, plaintiffs filed a motion for a temporary restraining order and preliminary injunction, seeking an emergency hearing and characterizing their claims as urgent, despite their delay in filing suit. Doc. 2 at 1, 20. The Court ordered defendants to respond by June 20, 2023. *See* Doc. 4 at 1.

Defendants requested an extension to respond to plaintiffs' lawsuit until August 7, 2023, which plaintiffs opposed. *See* Docs. 7–10. The Court granted the extension, holding that, because plaintiffs "delayed in filing" suit, there was "no immediate threat" to their alleged rights. Doc. 11 at 1–2.

## ARGUMENT

### I. PLAINTIFFS LACK ARTICLE III STANDING

At the threshold, plaintiffs lack Article III standing, and their claims should be dismissed accordingly for want of jurisdiction under Rule 12(b)(1).

Standing doctrine is well established. "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue — a bedrock constitutional requirement." *United States v. Texas*, 143 S. Ct. 1964, 1969 (2023). "Article III requires a plaintiff to show that she has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1638 (2023). Plaintiffs "bear[] the burden of establishing these elements," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and the federal statutes that plaintiffs invoke do not create Article III standing on their own, *see* 42 U.S.C.

§ 2000bb-1(c) ("Standing to assert a [RFRA] claim … shall be governed by … [A]rticle III"); *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (APA actions "must satisfy … Article III[]"); *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) ("[DJA] actions must satisfy Article III[]").

Plaintiffs fail to satisfy Article III's traceability and redressability requirements for two separate reasons, detailed below.

**A.  An unchallenged legal ground renders Mr. Green ineligible for a visa**

First, Mr. Green's R-1 visa was refused on two independent legal grounds — a misrepresentation under § 1182(a)(6)(C)(i) and a failure to overcome the presumption of immigrant status of § 1184(b) — yet plaintiffs challenge only the misrepresentation ground under RFRA and the APA. Doc. 1-2 at 1–2. Mr. Green would thus remain ineligible for an R-1 visa even with a favorable judgment. Doc. 1 at 20; Doc. 2 at 2 (demanding an "immediate adjudication of Plaintiffs' visa application in Plaintiffs' favor"); *see Liberty Church*, 470 F. Supp. 3d at 77 n.2. Consequently, plaintiffs lack Article III standing. *E.g.*, Wright & Miller, Fed. Prac. & Proc. § 3531.5 (2023) (no causation or redressability where plaintiff "challenges the denial of a benefit on one ground" but is "ineligible for the benefit on some other ground"); *see Fuller v. Norton*, 86 F.3d 1016, 1027 (10th Cir. 1996) ("Even if we were to strike the challenged provision, [plaintiff] still would not fulfill the remaining requirements … and could not benefit from our decision"); *accord Maverick Media v. Hillsborough Cty.*, 528 F.3d 817, 820–21 (11th Cir. 2008) ("[A] plaintiff whose … applications were denied on the basis of one provision … but which could have been denied on the basis of some

alternate, but unchallenged regulation, does not have a redressable injury").

Indeed, plaintiffs devote most of their complaint to challenging the consular officer's misrepresentation finding under RFRA and the APA, *e.g.*, Doc. 1 ¶¶ 3–11, 39–43, 52–58, 62–65, 69, 72, 75 — but they mention the presumption-of-immigrant-status finding only twice, in passing, without raising any legal challenge to it under RFRA or the APA, *see id.* ¶¶ 51, 59.

Without citing any law or fact, plaintiffs say Mr. Green "overc[a]me that ground of ineligibility at the second interview." *Id.* ¶ 59. But the April 13, 2023 LegalNet email that plaintiffs attached to their complaint contradicts this conclusory allegation and controls in this case: "[A] consular officer refused your client's R-1 visa application under [§ 1182](a)(6)(C)(i) *and* [§ 1184](b)" of the INA. Doc. 1-2 at 1–2 (emphasis added); *e.g.*, *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020) (a Rule 12(b)(1) "factual [jurisdictional] attack goes beyond the allegations in the complaint"). So plaintiffs lack Article III standing, and this case should dismissed on that ground alone.

### B.  Plaintiffs lack standing to sue defendants without visa power

In all events, plaintiffs do not have Article III standing to sue defendants lacking authority over the visa process in this case, as those defendants could not have caused plaintiffs' alleged injury, and a judgment against them "would not give [plaintiffs] legally enforceable" relief. *Brackeen*, 143 S. Ct. at 1639.

That is because the INA grants consular officers exclusive authority to grant or refuse visa applications. *E.g.*, *Alshawy v. USCIS*, 2022 WL 970883, at *3 (D.D.C. 2022); *Logan v. Blinken*, 2022 WL 3715798, at *3 (D.D.C. 2022).

There is no administrative-appeal process for visa refusals, and the INA expressly precludes even the Secretary of State from controlling consular officers' determinations. *See* 8 U.S.C. § 1104(a) (removing from the Secretary of State "powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas"). As the LegalNet email made clear: "Whether or not your client made a material misrepresentation [under § 1182(a)(6)(C)(i)] is a factual determination that only a consular officer can decide," and a "finding of ineligibility under [§ 1184(b)]" is likewise a "factual determination made by the adjudicating consular officer and not subject to the [State] Department's review." Doc. 1-2 at 1–2.

So at minimum, the Court should dismiss the Secretary of State, the State Department, the Office of the Legal Adviser for Consular Affairs, and the Johannesburg and Cape Town Consulates for lack of jurisdiction under Article III and Rule 12(b)(1), as they had no role in refusing Mr. Green's visa and have no legal authority to redress any purported injury. *Ayno v. Blinken*, 2022 WL 4598513, at *2 (D.D.C. 2022) (no standing to sue defendants not involved in the visa process); *Whitlock v. DHS*, 2022 WL 424983, at *4 (D.D.C. 2022) (same); *Ashby v. State Dep't*, 2017 WL 1363323, at *3 (W.D.N.C. 2017) (same).

## II. PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Plaintiffs' claims also lack merit and should be dismissed under Rule 12(b)(6) because they (1) fail under the consular-nonreviewability doctrine and (2) are otherwise implausible under applicable law.

**A.  Plaintiffs' claims fail under the consular-nonreviewability doctrine**

Plaintiffs' claims run aground on the merits, first, under the deferential standard of review governing this case: the consular-nonreviewability doctrine.

**1.**  The doctrine is settled law. In general, it "bars judicial review of visa decisions made by [State Department] consular officials abroad." *Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019) (Barrett, J.) (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972)).

The doctrine "stem[s] from separation of powers concerns about intrusion on the political branches' authority" and expertise. *Del Valle v. Sec'y of State*, 16 F.4th 832, 837 (11th Cir. 2021). Indeed, "[f]or more than a century," the Supreme Court "has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018); *see Yafai*, 912 F.3d at 1020 ("Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions"); *Baaghil v. Miller*, 1 F.4th 427, 432 (6th Cir. 2021) (Sutton, J.) (the doctrine is a "no-trespass rule under which the courts rarely second guess the decisions of consulates to deny or grant [visa] applications").

That is because, "[i]n accord with ancient principles of the international law," the "power to exclude [noncitizens] is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers — a power to be exercised

exclusively by the political branches of government." *Mandel*, 408 U.S. at 765; *see Hawaii*, 138 S. Ct. at 2418 ("[D]ecisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances"). For these reasons, visa disputes have historically been handled through diplomatic channels — not by courts. *E.g.*, *London v. Phelps*, 22 F.2d 288, 290 (2d Cir. 1927) (visa dispute required "diplomatic complaint by the nation whose subject" filed suit).

Under this doctrine, "foreign nationals seeking admission" to the U.S. from abroad cannot challenge consular officers' visa refusals, as they "have no constitutional right to entry" under settled precedent. *Hawaii*, 138 S. Ct. at 2419; *Mandel*, 408 U.S. at 762 ("[U]nadmitted" noncitizens have "no constitutional right of entry" and cannot dispute visa refusals); *Baaghil*, 1 F.4th at 433 ("Noncitizens living abroad do not have any American constitutional rights" and cannot dispute visa refusals); *Liberty Church*, 470 F. Supp. 3d at 77 (same).

The doctrine also renders inviable visa challenges brought under the APA and DJA, which effectively seek to end-run the doctrine. *E.g.*, *Yafai*, 912 F.3d at 1023 (rejecting APA and DJA claims); *Baaghil*, 1 F.4th at 434 (the doctrine "predates the passage of the APA and amounts to [a] limitation on judicial review that supersedes the APA[]"); *Liberty Church*, 470 F. Supp. 3d at 77 (same); *Gogilashvili v. Holder*, 2012 WL 2394820, at *3 (E.D.N.Y. 2012) (the doctrine "precludes judicial review" of visa refusals "under the [DJA]").

Indeed, the Supreme Court has identified only one "limited exception to this

doctrine": "when the visa denial implicates a constitutional right of an American citizen." *Yafai*, 912 F.3d at 1021; *see Hawaii*, 138 S. Ct. at 2419. "Yet even" there, courts "may not disturb the consular officer's decision if the reason given is 'facially legitimate and bona fide.'" *Yafai*, 912 F.3d at 1021 (quoting *Mandel*, 408 U.S. at 769); *see Baaghil*, 1 F.4th at 432; *Del Valle*, 16 F.4th at 837.

As Justice Kennedy's controlling concurrence in *Din* held, "[f]or a consular officer's decision to be facially legitimate and bona fide, the consular officer must identify (1) a valid statute of inadmissibility and (2) the necessary 'discrete factual predicates' under the statute." *Yafai*, 912 F.3d at 1021 (quoting *Din*, 135 S. Ct. at 2140–41 (opinion of Kennedy, J.)). "When a statute 'specifies discrete factual predicates that the consular officer must find to exist before denying a visa,' the citation of the statutory predicates is itself sufficient." *Id.* (quoting *Din*, 135 S. Ct. at 2141 (opinion of Kennedy, J.)). "In other words, the consular officer need not disclose the underlying facts that led him to conclude that the statute was satisfied." *Id.*; *see Del Valle*, 16 F.4th at 841 (rejecting that consular officers must "identify the real-world facts (the who, what, when, where, why, and how)" behind visa refusals); *Baaghil*, 1 F.4th at 432 ("We do not look behind the decision," as "[e]ven a statutory citation … suffices"). Indeed, only an "'affirmative showing of bad faith' that is 'plausibly alleged with sufficient particularity' might justify more searching review." *Yafai*, 912 F.3d at 1022 (quoting *Din*, 135 S. Ct. at 2141 (opinion of Kennedy, J.)).

For decades, courts have applied this "deferential standard of review across

different contexts and constitutional claims," *Hawaii*, 138 S. Ct. at 2419, including to religion-based statutory and constitutional challenges, *e.g.*, *Rojas v. United States*, No. 22-130, Doc. 14 at 1–3 (D. Colo. 2022) (Free Exercise Clause); *Liberty Church*, 470 F. Supp. 3d at 79–81 (Establishment Clause), *aff'd*, 2021 WL 5355640 (1st Cir. 2021); *Qadar v. Mayorkas*, 2021 WL 1143851, at *8 (S.D.N.Y. Mar. 24, 2021) (RFRA claim); *Ashby v. Dep't of State*, 2019 WL 4451256, at *10 (M.D.N.C. 2019) (*Ashby II*) (RFRA claim); *Amiri*, 2018 WL 623652, at *3, *5–10 ("free exercise and establishment clauses"), *aff'd*, 818 F. App'x 523 (6th Cir. 2020).

**2.** Plaintiffs' claims fail under the consular-nonreviewability doctrine's "deferential standard of review." *Hawaii*, 138 S. Ct. at 2419.

**a.** Start with the Green family. For Mr. Green, Mrs. Green, and H.P.G. — South African citizens outside the U.S. — "the doctrine … applies in full force": This Court has "no authority to second guess the visa decisions" of the consular officers in South Africa and so must "leave those decisions in place." *Baaghil*, 1 F.4th at 433. Indeed, the Greens have "no constitutional right to entry" and thus no legal footing to challenge their visa refusals. *Hawaii*, 138 S. Ct. at 2419; *Mandel*, 408 U.S. at 762 (same); *Baaghil*, 1 F.4th at 433 (same); *Liberty Church*, 470 F. Supp. 3d at 77 (same).

Nor does RFRA alter that conclusion. RFRA "incorporate[s] the standard governing [constitutional] free exercise claims that prevailed before … *Employment Division v. Smith*, 494 U.S. 872 (1990)," when it was (and still is) well

understood that noncitizens outside the U.S. lack constitutional rights, *Rasul v. Myers*, 563 F.3d 527, 532–33 (D.C. Cir. 2009) (*Rasul II*); *cf. Tanzin v. Tanvir*, 141 S. Ct. 486, 492–93 (2020) ("RFRA reinstated pre-*Smith* protections and rights," and "background presumptions" that "exist[ed] at the time of [RFRA's] enactment can inform the understanding of a word or phrase" in RFRA). Accordingly, noncitizens outside the U.S., such as the Greens, "are not protected 'person[s]' under" RFRA and cannot bring RFRA claims. *Rasul II*, 563 F.3d at 532–33; *Rasul v. Myers*, 512 F.3d 644, 667–72 (D.C. Cir.) (explaining this conclusion in detail), *vacated on unrelated grounds*, 555 U.S. 1083 (2008); *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1334 (D.C. Cir. 2014) (same); *Bukhari v. Piedmont Reg'l Jail*, 2010 WL 3385179, at *3–5 (E.D. Va. 2010) (same); *cf. Int'l Dev. Agency v. All. for Open Soc'y*, 140 S. Ct. 2082, 2086 (2020) ("[F]oreign citizens outside U.S. territory do not possess [U.S. constitutional] rights").

Likewise, the Green family's APA and DJA claims die aborning, as the doctrine overrides those claims in their entirety. *E.g.*, *Yafai*, 912 F.3d at 1023 (APA and DJA); *Baaghil*, 1 F.4th at 434 (APA); *Liberty Church*, 470 F. Supp. 3d at 77 (APA); *Gogilashvili*, 2012 WL 2394820, at *3 (DJA).

**b.**  The claims of Calvary, a U.S. church, fail as well under the doctrine.

To start, the doctrine overrides Calvary's APA and DJA claims under the same decisions cited above. *E.g.*, *Yafai*, 912 F.3d at 1023 (APA and DJA).

The doctrine also applies with full force to Calvary's RFRA claim: RFRA is a statute, the doctrine's "limited exception" applies only "when the visa denial

implicates a *constitutional* right of an American citizen," *id.* at 1021 (emphasis added), and "legal claims based on statute should [not] receive greater protection than legal claims based on the Constitution," *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *see Ashby II*, 2019 WL 4451256, at *10 ("Plaintiffs' RFRA claim," "grounded in federal statute, rather than the U.S. Constitution," is "barred by consular non-reviewability"); *Qadar*, 2021 WL 1143851, at *8 (RFRA "challenges to the visa denials … fall outside the exception to consular non-reviewability for constitutional claims" and are "non-cognizable"). Calvary's RFRA claim thus fails on this ground alone.

But even if Calvary's RFRA claim were akin to a constitutional claim capable of triggering the very limited review that *Din* and *Mandel* permit, the claim would still fail. First, as detailed *infra* at 21–27, Calvary fails to plausibly plead that Mr. Green's "visa denial implicates [its] constitutional right[s]" under RFRA, *Yafai*, 912 F.3d at 1021, thus rendering the claim "unreviewable," *Liberty Church*, 470 F. Supp. 3d at 78. Second, in all events, consular officers more than satisfied the exception's requirements. Again, courts have applied the exception's "deferential standard of review," *Hawaii*, 138 S. Ct. at 2419, without limitation to alleged violations of religious rights, *e.g.*, *Rojas*, No. 22-130, Doc. 14 at 1–3 (D. Colo. 2022); *Liberty Church*, 470 F. Supp. 3d at 79–81; *Qadar*, 2021 WL 1143851, at *8; *Amiri*, 2018 WL 623652, at *3, *5–10. And here, consular officers identified two "valid statute[s] of inadmissibility" to refuse Mr. Green's R-1 visa: § 1182(a)(6)(C)(i) for misrepresentation and § 1184(b) for

failure to overcome the presumption of immigrant status. *Yafai*, 912 F.3d at 1021; *see* Doc. 1-2 at 1–2. Because those statutes "specif[y] discrete factual predicates that the consular officer must find to exist before denying a visa," that ends the inquiry: "[C]itation of [those] statutory predicates is itself sufficient." *Yafai*, 912 F.3d at 1021; *Del Valle*, 16 F.4th at 841; *Baaghil*, 1 F.4th at 432. Indeed, courts have specifically held that citing these same two INA provisions is enough on its own. *E.g.*, *Del Valle*, 16 F.4th at 842 ("[A] statutory citation [to the misrepresentation statute is] a facially legitimate and bona fide reason"); *Ashby*, 2017 WL 1363323, at *3 ("[T]he decision to deny [the] visa easily qualifies as facially legitimate because it is based on [§] 1184(b)"); *Rojas*, No. 22-130, Doc. 14 at 1–3 (D. Colo. 2022) (same under § 1184(b)).

In fact, the LegalNet email went above and beyond what the doctrine's narrow exception requires by summarizing specific facts underlying the consular officer's misrepresentation finding. *Yafai*, 912 F.3d at 1021 ("[C]onsular officer[s] need not disclose the underlying facts"); *Del Valle*, 16 F.4th at 841 (consular officers need not "identify the real-world facts"); *Baaghil*, 1 F.4th at 432 ("We do not look behind the decision"). The email recounted that, under § 1182(a)(6)(C)(i), a "consular officer determined that [Mr. Green] misrepresented his purpose of travel [on April 9, 2022] as one commensurate with a B-1/B-2 visa when in fact, he intended to engage in unauthorized employment for hire while in the United States, as an independent contractor." Doc. 1-2 at 1–2. Calvary may disagree with these findings, "challeng[ing] the accuracy of this

factual basis" — but "the Court lacks the authority … to resolve this dispute" under the doctrine's "limited exception," and Calvary's RFRA claim fails on the merits accordingly. *Liberty Church*, 470 F. Supp. 3d at 77, 81 n.8.

**3.**   Plaintiffs' efforts to avoid the consular-nonreviewability doctrine go nowhere. *First*, plaintiffs cite *Marczak v. Greene*, but that case did not address a consular officer's visa decision or the doctrine — it involved habeas-corpus proceedings in an immigration dispute and is thus inapposite. 971 F.2d 510, 513 (10th Cir. 1992). Moreover, *Greene* was decided 23 years before the Supreme Court's 2015 decision in *Din* clarifying the doctrine. And in any case, *Greene* held that, under *Mandel*, courts cannot "take license … to re-weigh the facts underlying [an immigration] decision" and reversed the district court for "improperly re-weigh[ing] the evidence and ma[king] its own findings of fact." *Greene*, 971 F.2d at 521. *Greene* thus supports defendants — not plaintiffs.

*Second*, plaintiffs repeatedly cite *O Centro v. Duke*, 286 F. Supp. 3d 1239 (D.N.M. 2017), but that case, too, is inapposite to the doctrine. It involved the denial of a *petition* by USCIS for classification of a noncitizen as a nonimmigrant religious worker — it did not involve the refusal of an R-1 *visa* by State Department consular officers, as this case does. *Id.* at 1246 ("USCIS denied this [R-1] petition"). So consular nonreviewability did not apply in that case and was not raised. *E.g.*, *Yafai*, 912 F.3d at 1020 (the doctrine "bars judicial review of *visa* decisions made by *consular* officials" (emphasis added)). Again, a USCIS-approved petition is "not a visa," and State Department "consular

officer[s] must independently determine that an applicant has met the [visa] requirements." *Liberty Church*, 470 F. Supp. 3d at 76; *see* 22 C.F.R. § 41.58(b).

*Third*, plaintiffs say RFRA "applies to all Federal law." Doc. 1 ¶ 32 (quoting 42 U.S.C. § 2000bb-3(a)). But RFRA merely creates "claim[s] or defense[s]" for "appropriate relief" in "judicial proceeding[s]," 42 U.S.C. § 2000bb-3(c) — it does not address the standards of review governing those claims or defenses applicable in any particular context, such as the settled and "deferential standard of review" of consular nonreviewability, *Hawaii*, 138 S. Ct. at 2419; *see* 42 U.S.C. § 2000bb-2(3) (RFRA litigants still must "meet[] the burdens of going forward with the evidence and of persuasion"). Indeed, RFRA does not override other settled and "judicially recognized doctrine[s]" predating the statute's enactment, such as qualified immunity. *Ajaj v. BOP*, 25 F.4th 805, 813–17 (10th Cir. 2022) (courts must "construe [RFRA] in light of … background presumption[s] … well-established when RFRA was enacted" (citing *Tanzin*, 141 S. Ct. at 492–93)); *Del Valle*, 16 F.4th at 838 (consular nonreviewability is "judicially created"). So the consular-nonreviewability doctrine applies to RFRA claims disputing visa refusals, just as it has long applied to all other claims disputing visa refusals. *Ashby II*, 2019 WL 4451256, at *10 (RFRA claim denied under consular nonreviewability); *Qadar*, 2021 WL 1143851, at *8 (same).

*Fourth* and finally, plaintiffs say consular officers here "acted in bad faith" by purportedly violating State Department internal directives and "incorrectly determin[ing]" that Mr. Green "engaged in unauthorized employment when on

his B1/B2 visa." Doc. 1 ¶ 58. The argument lacks merit for multiple reasons.

To start, plaintiffs allege bad faith for only the misrepresentation finding, not the independent finding of a failure to overcome the presumption of immigrant status. So "[e]ven if the Court were to set aside the [misrepresentation] determination," the consular officer "still provided at least one bona fide reason for Mr. [Green's] exclusion," meaning their claims still fail under the doctrine. *Liberty Church*, 470 F. Supp. 3d at 81 n.9.

In any event, even for the misrepresentation finding, bad faith requires "dishonest[y]" or an "illicit motive" on the part of consular officers, and neither is alleged here — much less "plausibly alleged with sufficient particularity." *Yafai*, 912 F.3d at 1022. Plaintiffs assert only that consular officers "bungled" internal State Department guidance found in the Foreign Affairs Manual (FAM) and purportedly misunderstood the facts — but neither shows bad faith. *Del Valle*, 16 F.4th at 843; *see, e.g.*, *Yafai*, 912 F.3d at 1022 ("[T]hat the officer did not believe [plaintiffs'] evidence does not mean that the officer was dishonest or had an illicit motive"); *Carter v. DHS*, 2021 WL 6062655, at *5 (D.D.C. 2021) (allegedly "violat[ing] established procedures or regulations" does not show bad faith); *Saleh v. Tillerson*, 293 F. Supp. 3d 419, 433 (S.D.N.Y. 2018) (allegedly acting "contrary to agency regulations," on "information [that] was incorrect," does not show bad faith); *see also Babamuradova v. Blinken*, 2022 WL 4479801, at *9 (D.D.C. 2022) (the FAM does not "carry the force of law" or "require the State Department to take any action"); 9 FAM § 101.2-1(b) (the

FAM is "policy and procedural guidance").

In fact, plaintiffs' own allegations "reflect[] a *good*-faith evaluation of [Mr. Green's] application." *Yafai*, 912 F.3d at 1022 (emphasis added). For example, plaintiffs allege that consular officers requested additional documents from Mr. Green multiple times and interviewed him in person three separate times over a three-month review period, Doc. 1 ¶¶ 51–54, and likewise, the LegalNet email described the reasons for Mr. Green's visa refusals, Doc. 1-2 at 1–2. "[R]equest[s] for additional documents," a "willingness to reconsider [the] application," and explanations for the visa refusals "suggest[] a desire to get it right" — they do not suggest bad faith. *Yafai*, 912 F.3d at 1022.

Plaintiffs' RFRA, APA, and DJA claims thus lack merit under the consular-nonreviewability doctrine, and they should be dismissed under Rule 12(b)(6).

**B. Plaintiffs otherwise fail to state RFRA claims**

Plaintiffs' RFRA claims fail on the merits — not only under the consular-nonreviewability doctrine — but also under RFRA itself.

**1.** RFRA's elements are not in dispute. "RFRA provides that the government 'shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability' unless [the government] demonstrates that the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Iglesia*, 718 F. App'x at 650 (quoting 42 U.S.C. § 2000bb-1(a)–(b)). "The government impermissibly burdens religious exercise if it: (1) requires participation in an activity prohibited by a sincerely held

religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent … to engage in conduct contrary to a sincerely held religious belief." *Id.* at 651. If a substantial burden is shown, the government "must justify the burden by establishing a sufficiently compelling interest and showing that it could not accommodate religion more without serving that interest less." *United States v. Friday*, 525 F.3d 938, 946 (10th Cir. 2008). Plaintiffs do not satisfy these requirements.

**a.** Again, start with the Green family. They cannot bring RFRA claims because they are South African citizens outside the U.S. *See supra* at 14–15 (citing *Rasul II*, 563 F.3d at 532–33; *Rasul*, 512 F.3d at 667–72; *Allaithi*, 753 F.3d at 1334; *Bukhari*, 2010 WL 3385179, at *3–5). But in any event, the Greens fail to allege, much less plausibly allege under Rule 12(b)(6), any "sincerely held religious belief," a required RFRA element. *Iglesia*, 718 F. App'x at 651. The complaint discusses only *Calvary's* "sincerely held religious belief that ministers should and must be compensated," *Calvary's* "right to choose [its] own minister," and how the visa refusal "infringed on *Calvary's* exercise of religion" — the complaint does not describe what the Greens believe and how those beliefs are allegedly burdened in any way. Doc. 1 ¶¶ 5, 7, 49, 65, 69 (emphasis added). So the Greens' RFRA claims lack merit and should be dismissed.

**b.** In any case, plaintiffs fail to plausibly allege a "substantial burden" on Calvary's two asserted religious beliefs. *Iglesia*, 718 F. App'x at 650.

To start, Mr. Green's visa refusals do not "prevent or restrict" Calvary from exercising its belief in paying ministers. *Id.* at 651. Rather, it prevents only *Mr. Green* from lawfully visiting the U.S. given his misrepresentation — Calvary remains free to exercise its belief that "ministers should and must be compensated," without government impediment. Doc. 1 ¶¶ 7, 49; *see* 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien who, by fraud or willfully misrepresenting a material fact, seeks … a visa … is inadmissible").

Nor was Mr. Green's visa refused because Calvary *exercised* its belief that Mr. Green should be paid — instead, the visa was denied because consular officers found reason to believe that, among other things, Mr. Green "*misrepresented* his purpose of travel as one commensurate with a B-1/B-2 visa when in fact, he intended" to work "as an independent contractor." Doc. 1-2 at 1 (emphasis added); *cf. Iglesia*, 718 F. App'x at 649, 650–52 (no substantial burden where noncitizen worship pastor's R-1 petition was denied based on "deficient bookkeeping," not the church's belief that "collections from parishioners would cover … his salary"). Calvary's religious beliefs had nothing to do with the decision, and plaintiffs do not plead otherwise. *E.g.*, Doc. 1 ¶ 55 (visa refused "under the fraud/willful misrepresentation ground"); *Liberty Church*, 470 F. Supp. 3d at 79 ("Liberty Church does not … plead that the consular officer denied Mr. Rocha a visa because of his role within Liberty Church or that the denial reflected any opinion as to the merits of the church's religious beliefs").

Neither does Mr. Green's visa refusal "prevent or restrict," *Iglesia*, 718 F.

App'x at 650, Calvary from "choos[ing its] own minister," Doc. 1 ¶ 65. The government has not ordered Calvary to "accept or retain an unwanted minister" whom they wish to fire or demote, or "punish[ed]" Calvary for "failing to do so," as plaintiffs suggest. Doc. 1 ¶ 1 (quoting *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 188 (2012)). In fact, the government has not ordered Calvary to do anything at all — the visa refusals govern the *Greens'* legal status alone and were based solely on Mr. Green's misrepresentation and failure to overcome the presumption of immigrant status. Doc. 1-2 at 1–2; *see Liberty Church*, 470 F. Supp. 3d at 78 ("[N]othing in the complaint would allow the Court to reasonably infer that the denial of Mr. Rocha's visa application rendered Liberty Church unable to employ a Director of Music and Media," and while "Liberty Church may have experienced some difficulty in finding a replacement for Mr. Rocha," the church "does not tie these difficulties to Defendants or otherwise suggest that Defendants prevented it from hiring another Director of Music and Media").

Besides, *Hosanna-Tabor* involved the "ministerial exception," an "affirmative defense" that churches may raise to avoid employment-discrimination liability after taking adverse action against their ministers, based on the principle that the government cannot force a church to retain an unwanted minister. 565 U.S. at 196 & n.4. This case is not an employment-discrimination case, and regardless, even the church in *Hosanna-Tabor* invoking the ministerial exception recognized that the right to choose a minster "does not apply to … laws that limit the pool of eligible employees to … lawful immigrants" —

"[i]mmigration … laws remain untouched." Reply at 20, 2011 WL 3919718; *see also Soc'y of Divine Word v. USCIS*, 2023 WL 4665116, at *7 (N.D. Ill. 2023) ("Limiting the pool of available employee[s] based on immigration status is not the same as interfering with a religious organization's hiring decision by pressuring them to hire or fire a particular employee, as in *Hosanna-Tabor*").

To support their RFRA substantial-burden theory, plaintiffs also lean heavily on *O Centro v. Duke*, but that case is again inapposite. There, USCIS denied a noncitizen minister's R-1 petition under a specific regulation requiring churches to pay religious workers, despite the plaintiff-church's religious belief that ministers should *not* be paid. 286 F. Supp. 3d at 1244–46. The plaintiffs there (represented by the same counsel here) thus framed the case as involving a "clear governmental directive to this particular Church to change what they believe in order to obtain" R status, and the court agreed. *Id.* at 1247.

That is not this case. The "clear governmental directive" at issue here — the misrepresentation statute — does not condition Mr. Green's visa status on Calvary's "chang[ing] what they believe" about compensating ministers or selecting specific pastors, *id.* — it conditions Mr. Green's visa status on his *honesty* in the application process, *see* 8 U.S.C. § 1182(a)(6)(C)(i). And here, after months of review and three in-person interviews, consular officers found reason to believe that Mr. Green violated this condition. *See* Doc. 1-2 at 1–2. That is why his visa was refused — not because of Calvary's religious views. *Liberty Church*, 470 F. Supp. 3d at 79. *O Centro* has no application here.

**b.**  Finally, regardless of anything else, defendants acted "in furtherance of a compelling governmental interest" under RFRA and through the "least restrictive means of furthering" that interest, another independent reason to reject plaintiffs' RFRA claims. 42 U.S.C. § 2000bb-1(b).

*First*, a compelling government interest is present in this case: preventing a specific visa applicant from obtaining a visa after he "misrepresented" to immigration officers "his purpose of travel as one commensurate with a B-1/B-2 visa" in April 2022 "when in fact, he intended to engage in unauthorized employment for hire while in the United States, as an independent contractor." Doc. 1-2 at 1. The INA and its regulations repeatedly emphasize the requirement and importance of honesty during the visa process, *see* 8 U.S.C. §§ 1202(c), 1202(e), 1202(h), 1361; 22 C.F.R. §§ 41.11(a), 41.103(b), 42.62; 8 C.F.R. § 214.1(f), including in the misrepresentation statute itself, *see* 8 U.S.C. § 1182(a)(6)(C)(i). And the Tenth Circuit has specifically upheld criminal convictions against RFRA challenges where the defendants engaged in conduct to "evade the immigration laws" and "ma[de] false statements to [immigration] officials." *United States v. Murry*, 31 F.4th 1274, 1283–84, 1289, 1292–93 (10th Cir. 2022). Indeed, even *O Centro* specifically recognizes that "preventing immigration fraud," when particularized in the case at hand, "is likely a compelling state interest." 286 F. Supp. 3d at 1265 (finding no compelling interest only because, unlike here, "there [were] no allegations of fraud").

Calvary, in effect, asserts a freewheeling right to select any minister it

chooses, no matter their legal status. But free-exercise doctrine is "not absolute." *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016). There are limits, and courts enforce them. *E.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 161, 164, 170 (1944) (rejecting free-exercise challenge to child-labor laws preventing "preach[ing]" of "the gospel" by an "ordained" child "minister[]"); *cf., e.g.*, *Alamo v. Clay*, 137 F.3d 1366, 1367 (D.C. Cir. 1998) (rejecting, on jurisdictional grounds, a church's RFRA claim "challenging [a parole board's] decision denying parole to its pastor" imprisoned for tax fraud); *United States v. Aguilar*, 883 F.2d 662, 696 (9th Cir. 1989) (government's "interest in controlling immigration outweigh[ed] … religious interest").

*Second*, enforcing the misrepresentation statute against Mr. Green was narrowly tailored to this compelling government interest. *See* 42 U.S.C. § 2000bb-1(b). The line between the means (applying the misrepresentation statute barring visas for applicants who make misrepresentations to immigration officers) and the ends (preventing Mr. Green from obtaining a visa based on his misrepresentation to immigration officers) is clear and narrowly drawn, and Congress specifically dictated the result in these circumstances. *See* 8 U.S.C. § 1201(g) ("No visa … shall be issued" if "it appears to the consular officer" that a noncitizen is "ineligible to receive a visa").

Plaintiffs' RFRA claims lack merit, and the Court should dismiss them.

## CONCLUSION

The Court should grant defendants' motion to dismiss plaintiffs' claims under Rules 12(b)(1) and 12(b)(6).

August 7, 2023                          Respectfully submitted,

                                        Alexander M.M. Uballez
                                          *United States Attorney*

                                          *s/ Benjamin G. Minegar*
                                        Benjamin G. Minegar
                                          *Assistant United States Attorney*
                                        P.O. Box 607
                                        Albuquerque, NM 87103
                                        (505) 346-7274
                                        benjamin.minegar@usdoj.gov


## CERTIFICATE OF SERVICE

I certify that, on August 7, 2023, I filed this document electronically through CM/ECF, causing all counsel to be served by electronic means.

                                          *s/ Benjamin G. Minegar*
                                        Benjamin G. Minegar