# United States District Court
## DISTRICT OF NEW MEXICO

CALVARY ALBUQUERQUE, INC.,
STEFAN DAVID GRANT GREEN,
KEILAH ANNA GREEN, *and*
H.P.G., *a minor*,

    *Plaintiffs,*

   *v.*

ANTONY BLINKEN, *U.S. Secretary of
State,* U.S. DEPARTMENT OF STATE,
OFFICE OF THE LEGAL ADVISER
FOR CONSULAR AFFAIRS, U.S.
CONSULATE JOHANNESBURG, U.S.
CONSULATE CAPE TOWN, *and*
UNKNOWN CONSULAR OFFICER,

    *Defendants.*

No. 1:23-cv-00486-KWR-KK

## REPLY SUPPORTING DEFENDANTS'
## RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS

Alexander M.M. Uballez
 *United States Attorney*

Benjamin G. Minegar
 *Assistant United States Attorney*
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274
benjamin.minegar@usdoj.gov

Defendants' Rule 12(b)(1) and 12(b)(6) dismissal motion establishes that plaintiffs lack Article III standing, Doc. 12 at 7–10, and that their claims fail on the merits under the longstanding doctrine of consular nonreviewability and RFRA itself, *id.* at 10–27. Plaintiffs resist these conclusions, but their arguments are ill-founded. The Court should reject them and grant the motion.

## I. PLAINTIFFS LACK ARTICLE III STANDING

Article III standing is "always an antecedent question" to the merits, *Steel Co. v. Citizens*, 523 U.S. 83, 101 (1998), yet plaintiffs do not address standing until the end of their brief, *see* Doc. 16 at 20–24. This fails.

**A.** As the 12(b)(1) motion explains, plaintiffs lack standing, first, because consular officers denied Mr. Green a visa on two independent legal grounds — a misrepresentation under § 1182(a)(6)(C)(i) and a failure to overcome the immigrant-status presumption of § 1184(b) — yet plaintiffs challenge only the misrepresentation ground. Doc. 12 at 8–9. Plaintiffs' responses lack merit.

First, plaintiffs say that, because a consular officer refused Mr. Green's second visa application citing § 1182(a)(6)(C)(i), "any denial under § 1184(b) … is *presumed* to have been overcome." Doc. 16 at 21 (emphasis added). For support, they cite: Nothing. Indeed, plaintiffs "bear[] the burden of establishing" standing under Rule 12(b)(1), *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), yet they cite no legal authority for their "presumption" theory. Their bare assertions should be rejected accordingly. The applicable regulations make clear: "An applicant for a nonimmigrant visa … *shall* be presumed to be an immigrant *until the consular officer is satisfied* that the alien is entitled to a

nonimmigrant status," and a "nonimmigrant visa *shall not be issued* to an alien who has failed to overcome the presumption of immigrant status." 22 C.F.R. § 41.11(a)–(b) (emphasis added). Plaintiffs cite no evidence — including the exhibits they attach to their brief — providing that a consular officer concluded that Mr. Green "overc[a]me the presumption of immigrant status," as the regulations require, and no such evidence exists. *Id.*

Reaching for standing, plaintiffs attack the LegalNet email, which "confirm[s]" that consular officers refused the visa "under [§ 1182](a)(6)(C)(i) *and* [§ 1184](b)" — two distinct legal grounds. Doc. 1-2 at 1–2 (emphasis added). Plaintiffs say LegalNet cannot refuse a visa because it is "not a consular officer." Doc. 16 at 21. But this lacks merit. LegalNet did not refuse Mr. Green's visa applications; consular officers did, and LegalNet staff merely "*confirm[ed]*" with those officers their two distinct reasons for doing so, as the email explains. Doc. 1-2 at 1–2 (emphasis added); *see* 9 FAM § 103.4-2(a) ("The LegalNet staff works with posts and divisions in the Visa Office to prepare responses").

**B.** Plaintiffs also lack standing to sue defendants without visa power, as the 12(b)(1) motion explains, meaning only "Unknown Consular Officer" could be a proper defendant. Doc. 12 at 9–10. Plaintiffs cite various district court decisions to argue that the other defendants here are "properly included." Doc. 16 at 23–24. But in each cited case, the government did not move to dismiss the defendants that plaintiffs identify in parentheticals, meaning the courts there did not address those defendants. *See id.* Unlike in those cases,

defendants here specifically move to dismiss *all* non-consular-officer defend-

ants, because the INA is clear: Only consular officers are empowered to issue

or refuse visas. *E.g.*, 8 U.S.C. §§ 1104(a), 1201(a)(1), 1201(g).

## II. PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Plaintiffs not only lack standing under Rule 12(b)(1); they also bring merit-

less claims that should be dismissed under Rule 12(b)(6).

### A. Plaintiffs' claims fail under the consular-nonreviewability doctrine

The 12(b)(6) motion establishes that plaintiffs' RFRA, APA, and DJA claims

fail on the merits under the longstanding doctrine of consular nonreviewabil-

ity. Doc. 12 at 11–21. To recap: Consular nonreviewability overrides plaintiffs'

APA and DJA claims in their entirety, which seek to end-run the doctrine. *Id.*

at 12, 15. The doctrine also renders meritless the Green family's RFRA claims,

as the Greens are noncitizens outside the U.S. and thus lack legal footing to

dispute the visa refusal. *Id.* at 12, 14–15. Finally, consular nonreviewability

overcomes Calvary's RFRA claim because Calvary does not satisfy the doc-

trine's lone, narrow exception for U.S. citizens bringing constitutional claims.

*Id.* at 12–13, 15–21. Again, Calvary pleads only *statutory* claims not triggering

the exception, *id.* at 15–16; the church fails to plead a plausible RFRA claim in

any event, *id.* at 16, 21–27; consular officers gave two independent, facially

legitimate, and bona fide reasons for refusing the visa, *id.* at 16–17; and the

officers did not act in bad faith, *id.* at 19–20. Plaintiffs' responses fail.

***"[A]ll Federal Laws."*** Plaintiffs first say RFRA "trumps" consular nonre-

viewability because the doctrine "stems from … the INA" and RFRA applies to

"all Federal Laws." Doc. 16 at 4–6 (their underlining). This is incorrect.

Consular nonreviewability does not "stem" from the INA. It is a "judicially created" doctrine grounded in the separation of powers. *Del Valle v. Sec'y of State*, 16 F.4th 832, 838 (11th Cir. 2021). Plaintiffs concede as much, contradicting their own argument: The doctrine is "*judicial* in origin," they confirm, and "informed by [the judiciary's] respect for *the separation of powers*." Doc. 16 at 16 (emphasis added) (quoting *Allen v. Milas*, 896 F.3d 1094, 1101 (9th Cir. 2018)). Plaintiffs do not cite any INA provision creating consular nonreviewability, and no such provision exists — the INA was enacted in 1952, while the doctrine has existed "[f]or more than a century." *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018). So plaintiffs' INA argument has no foundation.

Without the INA, plaintiffs resort to the argument that, because RFRA purports to amend "all Federal Laws," RFRA overrides all federal legal doctrines, including consular nonreviewability, and "provides a direct link to the heart of the matter." Doc. 16 at 4–6, 9–10. This, too, is incorrect.

By its terms, RFRA creates only "claim[s] or defense[s]" for "appropriate relief" in federal "judicial proceeding[s]" — it does not address the judicial standards of review, or other background principles, governing those claims or defenses in any particular context. 42 U.S.C. § 2000bb-1(c). And consular nonreviewability, the Supreme Court has explained, is a "deferential standard of review," *Hawaii*, 138 S. Ct. at 2419; Doc. 12 at 19, as plaintiffs appear to concede, *see* Doc. 16 at 16 (calling the doctrine a "scope of review"); *see also Allen*,

— 4 —

896 F.3d at 1108 ("[C]onsular nonreviewability is a limitation on the scope of our judicial review"). Consular nonreviewability has been applied to RFRA claims accordingly. *E.g.*, *Qadar v. Mayorkas*, 2021 WL 1143851, at \*8 (S.D.N.Y. 2021); *Ashby v. Dep't of State*, 2019 WL 4451256, at \*10 (M.D.N.C. 2019). Plaintiffs nitpick these two RFRA decisions, but they cite *no authority* for their argument that RFRA does away with consular nonreviewability. Doc. 16 at 6–8.

Case law confirms: RFRA does not apply in a vacuum. Background principles still govern. And with this understanding, court have restricted the scope of RFRA claims under various federal legal principles, even though RFRA says it "applies to all Federal law." 42 U.S.C. § 2000bb-3(a). For example:

- The Federal Rules of Civil Procedure, and judicial interpretations of those Rules, restrict RFRA claims, even though the Rules and case precedent are "Federal law." *E.g.*, *Hobby Lobby v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (injunction standard); *Sabbath v. Hicks*, 2021 WL 1300602, at \*2, \*7 (D. Colo. 2021) (plaintiff "failed to state a RFRA claim" under Rule 12(b)(6)).

- Federal qualified immunity restricts RFRA claims. *E.g.*, *Ajaj v. BOP*, 25 F.4th 805, 813–17 (10th Cir. 2022); *Mack v. Yost*, 63 F.4th 211, 221–27 (3d Cir. 2023) (collecting cases and rejecting the notion that RFRA is "special").

- Federal judicial immunity restricts RFRA claims. *E.g.*, *Azzarmi v. Donnelly*, 2021 WL 405491, at \*1–2 (E.D.N.Y. 2021) (dismissing a RFRA claim against a federal judge acting in her judicial capacity).

- Federal prosecutorial immunity restricts RFRA claims. *E.g.*, *Bundy v.*

*Sessions*, 812 F. App'x 1, 3 (D.C. Cir. 2020) ("RFRA … claims against the Attorneys General fail based on absolute prosecutorial immunity").

- Federal sovereign immunity restricts RFRA claims. *E.g.*, *Shields of Strength v. DOD*, 2023 WL 3293279, at \*5 (E.D. Tex. 2023).

- A catchall federal statute of limitations, 28 U.S.C. § 1658(a), restricts RFRA claims even though RFRA postdates this provision. *E.g.*, *Al-Sadun v. DCFS*, 2011 WL 1378638, at \*3 (N.D. Ill. 2011).

- Federal waiver and forfeiture rules restrict RFRA claims. *United States v. Amer*, 110 F.3d 873, 879 n.1 (2d Cir. 1997) (forfeiture); *Ajaj v. United States*, 2020 WL 5758521, at \*8 (D. Colo. 2020) (waiver).

- Federal equitable defenses, like laches, restrict RFRA claims. *E.g.*, *Sioux Tribe v. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 84–88 (D.D.C. 2017).

- Federal preclusion principles, like collateral estoppel, restrict RFRA claims. *E.g.*, *Olsen v. Mukasey*, 541 F.3d 827, 830–31 (8th Cir. 2008).

- Federal venue doctrines, like forum non conveniens, restrict RFRA claims. *E.g.*, *Hueter v. Kruse*, 610 F. Supp. 3d 60, 66–72 (D.D.C. 2022).

- Federal administrative-exhaustion rules restrict RFRA claims in, for instance, employment disputes, *e.g.*, *Francis v. Mineta*, 505 F.3d 266, 267–72 (3d Cir. 2007), and prisoner litigation, *e.g.*, *Jackson v. D.C.*, 254 F.3d 262, 266–67 (D.C. Cir. 2001).

- Federal rules governing facial and as-applied constitutional challenges restrict RFRA claims. *E.g.*, *United States v. Friday*, 525 F.3d 938, 950–51

(10th Cir. 2008) (limiting RFRA claim based on as-applied rules).

- And federal prudential-standing rules restrict RFRA claims. *Nebraska v. HHS*, 877 F. Supp. 2d 777, 799 (D. Neb. 2012) (U.S. states lacked nonconstitutional prudential standing to sue federal government under RFRA).

RFRA mentions *none* of these federal rules or doctrines — yet courts have applied them without controversy to restrict the scope of RFRA claims. So plaintiffs' absolutism that RFRA "bypass[es] *any* judicial unwillingness to right a wrong" is incorrect. Doc. 16 at 9 (emphasis added). It also proves too much. Accepting their argument would require us to "disregard … such basic matters as personal jurisdiction, venue, and statutes of limitations" — even federal precedent. *Jackson*, 254 F.3d at 266. "Neither [RFRA] nor its legislative history suggests that Congress intended such an astonishing result," and plaintiffs offer no limiting principle for their apparently limitless theory, much less precedent holding that RFRA nullifies consular nonreviewability. *Id.*

***"Bad Faith."*** Plaintiffs next argue that, even if consular nonreviewability applies, they satisfy it. Doc. 16 at 17–20. Plaintiffs, however, do not dispute (and thus implicitly concede) that the Greens lack legal footing under the doctrine to challenge the visa refusal as noncitizens outside the U.S., Doc. 12 at 12, 14, or that consular officers satisfied the "facially legitimate and bona fide" standard for Calvary's claims by citing §§ 1182(a)(6)(C)(i) and 1184(b) to refuse the visa, *id.* at 12 – 13, 15–18. Indeed, plaintiffs' sole argument is that a "more robust review" is allegedly required under the doctrine because consular

officers acted in "bad faith" by, for instance, "knowingly refus[ing] to follow" FAM guidance on minister compensation. Doc. 16 at 17–20. This is mistaken.

Defendants already addressed plaintiffs' bad-faith contentions at length in their motion — again, allegedly misapplying nonbinding FAM guidance is not bad faith. Doc. 12 at 19–22. But regardless, plaintiffs fail to even allege plausible misapplications of the FAM. (Find the FAM here: https://fam.state.gov/).

To explain: After months of review, requests for more documents, and three in-person interviews, consular officers found that, while visiting on a B-1/B-2 visa, Mr. Green engaged in U.S. "employment for hire" as an "independent contractor" that was "unauthorized." Doc. 1-2 at 1–2. Consular officers followed the FAM to reach these conclusions. To start, the B-1/B-2 regulations, which control over the FAM, bar U.S. employment and contract work without authorization. 22 C.F.R. § 41.31(b)(1); 8 C.F.R. § 214.1(e). The FAM says the same thing: "[I]ssuance of a B-1 visa is *not appropriate* for applicants who intend to obtain and engage in [U.S.] employment." 9 FAM § 402.2-5(A)(a) (emphasis added). Yes, the FAM also says missionaries may accept "allowance[s]" or "reimbursement[s]," *id.* § 402.2-5(C)(1)(a)(3) — but consular officers here found *contract employment without prior authorization*, not allowances or reimbursements, Doc. 1-2 at 1–2, and this same FAM provision bars "labor for hire" to obtain a U.S. "salary or remuneration," 9 FAM § 402.2-5(C)(1)(a)(3). So consular officers followed the FAM, and plaintiffs fail to plausibly allege bad faith on this ground — *i.e.*, "dishonest[y]" or an "illicit motive." *Yafai v. Pompeo*, 912

F.3d 1018, 1022 (7th Cir. 2019). Plaintiffs do not agree with the officers' conclusions under the FAM — but "[m]aking an affirmative showing of bad faith requires … *more* than an unfavorable decision." *Id.* (emphasis added).

One more word about the FAM: Plaintiffs repeatedly reference "honoraria." Doc. 16 (using the term 11 times). But the FAM permits only "*an honorarium payment*" (*i.e.*, one payment) for "*academic* activities," like "lecturing, guest teaching, or performing in an *academic* sponsored festival." 9 FAM § 402.2-5(F)(2) (emphasis added). This provision governing only "academic" activity has no bearing here, and plaintiffs' "honoraria" arguments fail accordingly.

Last on bad faith, *Khachatryan v. Blinken* is inapposite. 4 F.4th 841 (9th Cir. 2021). There, the court found bad faith where consular officers allegedly (1) "stubbornly refus[ed] to accept" three separate findings by USCIS that the visa applicant did not engage in marriage fraud and (2) attempted to use a "much-belated and out-of-the-blue assertion that [the applicant] had committed a *different* form of fraud more than 13 years earlier" to justify the visa refusal. *Id.* at 852–53. No such conduct is alleged here. *See* Doc. 1.

***"APA and DJA."*** To attempt to dodge consular nonreviewability, plaintiffs suggest that their APA and DJA claims "still apply" and permit review of Mr. Green's visa refusal. Doc. 16 at 16.

Not so. Indeed, the only authority that plaintiffs cite specifically holds that the "APA provides *no avenue for review* of a consular officer's adjudication of a visa" and that finding otherwise would "convert[] consular nonreviewability

into consular reviewability." *Allen*, 896 F.3d at 1097, 1103–09 (emphasis added). Numerous other decisions reject APA and DJA claims on the same grounds as *Allen*, as defendants' motion details, and plaintiffs fail to cite a single decision allowing either an APA or DJA claim to edge past consular nonreviewability. Doc. 12 at 12, 15 (collecting decisions and applying them to plaintiffs' APA and DJA claims). So plaintiffs' APA and DJA claims yield to consular nonreviewability and should be dismissed under Rule 12(b)(6).

## B.  Plaintiffs otherwise fail to state RFRA claims

Plaintiffs' claims also fail on the merits under RFRA itself. As defendants' motion explains, the Greens' RFRA claims founder because the Greens are not "person[s]" with RFRA rights and, regardless, they do not allege any sincerely held religious beliefs, Doc. 12 at 14–15, 22; Calvary fails to plausibly allege a substantial burden on its religious beliefs to choose and pay ministers, *id.* at 23–25; and consular officers refused Mr. Green's visa because of his misrepresentation, thus furthering a compelling government interest, *id.* at 25–27. Plaintiffs contend otherwise, but their arguments lack merit.

***The Greens' RFRA claims.*** First, the Greens say they can bring RFRA claims even though they are noncitizens outside the U.S. because of *O Centro v. Duke*, 286 F. Supp. 3d 1239 (D.N.M. 2017). The court there said "'persons' in the [U.S.] immigration system have RFRA rights." *Id.* at 1258–59 n.11. But the court said so — not based on statutory text, precedent, or any other legal principle — but because the parties *did "not discuss[]"* the issue and the court *could not "find any case"* about it. *Id.* (emphasis added). Here, defendants' motion

— 10 —

cites multiple cases holding specifically that noncitizens outside the U.S. "are not protected 'person[s]' under [RFRA]." *Rasul v. Myers*, 563 F.3d 527, 532–33 (D.C. Cir. 2009) (*Rasul II*) ("reinstat[ing]" the lengthy historical analysis on the issue of *Rasul v. Myers*, 512 F.3d 644, 667–72 (D.C. Cir.), *vacated on unrelated grounds*, 555 U.S. 1083 (2008)); Doc. 12 at 15 (collecting other decisions). Plaintiffs do not mention, much less refute, these thoroughly reasoned decisions, and the Court should follow them. *O Centro* is unpersuasive here, as the court there candidly admitted that it simply could not "find" these decisions in its research. 286 F. Supp. 3d at 1258–59 n.11. One final note here: Plaintiffs say this is "really [an issue] of standing," but that is incorrect. Doc. 16 at 22. It is a merits-based "matter of statutory interpretation" concerning RFRA's term "person" that is unrelated to Article III standing. *Rasul II*, 563 F.3d at 532.

Next, even though plaintiffs' complaint discusses only *Calvary's* religious beliefs, Doc. 12 at 22, Mr. Green says *his* RFRA claim survives because defendants acted in "violation of *his* sincerely held belief that ministers should be compensated." Doc. 16 at 23 (emphasis added). Plaintiffs do not allege this new fact in their complaint, and the Court should disregard it accordingly. As plaintiffs acknowledge, "[t]o survive a motion to dismiss," the "*complaint*" must state a claim — not the brief opposing dismissal. *Id.* at 4 (emphasis added); *e.g.*, *Edmond City v. Lawrence*, 2023 WL 4921527, at *2 (W.D. Okla. 2023) (courts do not consider "additional facts asserted in a memorandum opposing the motion to dismiss" but not in the complaint itself). (And this same analysis should

be applied to plaintiffs' new assertion in their opposition that an "exemption was sought," which likewise does not appear in the complaint. Doc. 16 at 11.).

***Calvary's RFRA claim.*** Calvary, for its part, says its RFRA claim survives because, by refusing Mr. Green's visa, consular officers told Calvary that "it cannot pay a foreign national itinerant minister," thus violating its beliefs. Doc. 16 at 14. The officers, Calvary says, "denied [Mr. Green's] visa *solely* due to the payments made" to him, *id.* (emphasis added), and "punished [Calvary] *solely* because it chose to pay Mr. Green," *id.* at 11 (emphasis added).

This is false. Calvary ignores the elephant in the room. Consular officers did not refuse the visa because Calvary paid Mr. Green — they refused the visa because *Mr. Green misrepresented the facts*. Again, Mr. Green came to the U.S. on a B-1/B-2 visitor visa barring employment for hire without prior authorization and then *promptly engaged in employment for hire* at Calvary, without clearing it first with immigration officials, as the law requires. 22 C.F.R. § 41.31(b)(1); 8 C.F.R. § 214.1(e). This was suspicious conduct, and after months of review and three in-person interviews, consular officers concluded that Mr. Green misrepresented the "purpose of his [B-1/B-2] travel" in April 2022. Doc. 1-2 at 1–2. *That* is why his visa was refused. Calvary's conduct had nothing to do with it, and the visa refusal governs the Greens' conduct alone — not Calvary's. Calvary thus remains free to choose and pay any minister it likes — but Calvary's beliefs do not elevate those ministers above the law.

*   *   *

The motion to dismiss should be granted.

October 6, 2023                          Respectfully submitted,

                                         Alexander M.M. Uballez
                                          *United States Attorney*

                                          *s/ Benjamin G. Minegar*
                                         _____
                                         Benjamin G. Minegar
                                          *Assistant United States Attorney*
                                         P.O. Box 607
                                         Albuquerque, NM 87103
                                         (505) 346-7274
                                         benjamin.minegar@usdoj.gov


## CERTIFICATE OF SERVICE

I certify that, on October 6, 2023, I filed this document electronically through CM/ECF, causing all counsel to be served by electronic means.

                                          *s/ Benjamin G. Minegar*
                                         _____
                                         Benjamin G. Minegar