# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

CALVARY ALBUQUERQUE, INC,
STEFAN DAVID GRANT GREEN,
KEILAH ANNA GREEN, and H.P.G, a minor,

        Plaintiffs,

        v.                           No. 1:23-cv-00486-KWR-KK

ANTONY BLINKEN,
_U.S. Secretary of State,_
U.S. DEPARTMENT OF STATE, OFFICE
OF THE LEGAL ADVISER FOR
CONSULAR AFFAIRS, U.S. CONSULATE
JOHANNESBUERG, U.S. CONSULATE
CAPE TOWN, and UNKNOWN CONSULAR
OFFICER,

        Defendants.

## <u>MEMORANDUM ORDER AND OPINION</u>

THIS MATTER comes before the Court upon the Plaintiffs' Motion for Temporary restraining Order and/or Preliminary Injunctive Relief (**Doc. 2**) and the Defendants' Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) (**Doc. 12**). Having reviewed the parties' pleadings and the relevant law, the Court finds the Plaintiffs' Motion for Injunctive Relief (**Doc. 2**) is not well-taken and therefore, is **DENIED**. The Court also finds that the Defendants' Motion to Dismiss (**Doc. 12**) is well-taken and, therefore, is **GRANTED**.

## BACKGROUND

Plaintiff Stefan David Grant Green, a South African citizen, traveled to the United States on a B-1/B-2 visa[1] on February 28, 2022, spending his monthlong trip songwriting and leading

---

[1] A B-1/B-2 visa allows noncitizens with a residence in a foreign country with no intention of abandoning their residence to visit the United States temporarily for business or pleasure. The meaning of business is limited in the

worship services at churches around the country. **Doc. 1 at 14.** On April 9, 2022, Mr. Green traveled again to the United States with his wife and minor son—Plaintiffs Keilah Green and H.P.G.—to visit Plaintiff Calvary Albuquerque, Inc. (hereinafter "Calvary Church"), attend the church's Easter Conference, and determine if Albuquerque "would ultimately be a good fit for Mr. Green and his family to spend an extended period of time." *Id.*

On April 25, 2022, Calvary Church filed an I-129 petition to sponsor Mr. Green for R-1 status as a first step to hiring him as the church's Worship Director.[2] *Id.* **at 15.** After the petition was approved on August 29, 2022, Mr. Green's B-1/B-2 visa was automatically converted to R-1 status, and Calvary Church put Mr. Green on payroll as a member of its pastoral staff. *Id;* **doc. 2 at 9.** In the four months between submitting the I-129 petition and the approval, Calvary Church provided Mr. Green with honorariums and gifts for leading its worship services. **Doc. 1 at 15.** Compensating ministers this way is a core tenet of the Plaintiffs' faith. **Docs. 1 at 15; 2-1 at 1.**

Mr. Green and his family attended an R-1/R-2 visa interview at the U.S. Consulate in Cape Town on November 17, 2022. *Id.* **at 15-16.** During the interview, Mr. Green notified the consular officer that he received honoraria and allowances from Calvary Church in the months

---

context of a B-1/B-2 visa; visitors may consult with business associates or attend professional conferences but are prohibited from engaging in local employment or labor for hire. 22 C.F.R. § 41.31.

[2] The Immigration and Nationality Act (the "INA") allows ministers and other religious workers to enter and stay in the United States under a nonimmigrant visa, known as an R-1 visa, for up to five years. To obtain the visa, a religious organization seeking to sponsor an R-1 applicant submits a petition to the United States Citizenship and Immigration Services ("USCIS"). The petitioner organization must: (1) establish that the R-1 visa applicant has been a member of the same denomination as the petitioner church for at least two years preceding the petition—the "denomination requirement"—and demonstrate its intention and ability to compensate the R-1 visa applicant—the "compensation regulation." *Iglesia Pentecostal,* 718 Fed. Appx. 646, 648 (10th Cir. 2017) (unpublished); 8 U.S.C. §§ 1101(a)(15)(R)-(i), 1101(a)(27)(C)(ii); 8 C.F.R. §§ 204.5(m); 214.2(r)(11). The spouse and children of a R-1 nonimmigrant may qualify for dependent R-2 status if their primary purpose in coming to the United States is to join or accompany the R-1 beneficiary.

However, an approved R-1 petition does not guarantee that the applicant will obtain a visa. After USCIS approves the petition, a consular officer independently determines that an applicant can receive a R-1 immigrant visa to enter the United States. U. S. CITIZENSHIP AND IMMIGRATION SERVICES, *R-1 Nonimmigrant Religious Workers,* https://www.uscis.gov/working-in-the-united-states/temporary-workers/r-1-nonimmigrant-religious-workers [last visited February 26, 2024].

before his R-1 petition was approved. *Id.* **at 16.** After the interview, the consular officer denied

Mr. Green's R-1 visa because Mr. Green had failed to overcome his presumption of immigrant

status under 8 U.S.C. § 214(b).[3] *Id;* **doc. 16-2.** Mr. Green then re-filed his visa application and

had two more in-person interviews at the U.S. Consulate in Johannesburg on December 14,

2022, and January 19, 2023. **Docs. 1 at 17**; **12 at 7.** During these interviews, the consular

officers focused on Calvary Church's payments to Mr. Green before USCIS approved the R-1

petition. **Doc. 1 at 16-17.**

Mr. Green's R-1 visa application was again denied, this time based on misrepresentation

under 8 U.S.C. § 212(a)(6)(C)(i).[4] **Docs. 12 at 7; 16-1.** Plaintiffs' attorneys contacted Defendant

Office of the Legal Adviser for Consular Affairs to confirm the reasons for Mr. Green's visa

denial. **Doc. 1 at 17.** On April 13, 2023, the Office of the Legal Adviser confirmed two separate

bases for the visa refusal by email (hereinafter the "LegalNet opinion"). **Doc. 1-2.** First, the

consular officer made a factual determination that Mr. Green materially misrepresented the

purpose of his travel to a border official upon entering the United States on April 9, 2022.[5] **Doc.**

---

[3] 8 U.S.C. § 214 (b)—*Presumption of status* provides that "Every alien (other than a nonimmigrant described in subparagraph (L) or (V) of section 1101(a)(15) of this title, and other than a nonimmigrant described in any provision of section 1101(a)(15)(H)(i) of this title except subclause (b1) of such section) shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title."

[4] 8 U.S.C. § 1182 (a)(6)(C)(i)—*Misrepresentation* states, "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."

[5] The State Department's Foreign Affairs Manual is "the single, comprehensive, and authoritative source for the Department's organization structure, policies, and procedures that govern the operations of the State Department. *See* U.S. DEP'T OF STATE, *Foreign Affairs Manual*, https://fam.state.gov [last visited, February 26, 2024].

9 FAM § 302.9-4(B)(3)(g)(2) states that a consular officer "may presume that the applicant made a willful representation (i.e., you may presume that the applicant's representations about engaging in only status-compliance activity were willful misrepresentations of their intentions in seeking a visa of admission to the United States)" if an individual engages in conduct inconsistent with their nonimmigrant status within 90 days of visa application or admission to the United States. A consular officer should apply the 90 Day Rule if "an alien states on their

**2-2 at 1.** After three interviews, the consular officer concluded that Mr. Green represented the

purpose of his travel to the border official as commensurate with a B-1/B-2 visa but that he

actually intended to engage in unauthorized employment for hire as an independent contractor at

Calvary Church.[6] **Doc. 12 at 6.** Second, under section 214(b), the consular officer was not

satisfied that Mr. Green would depart the United States after the expiration or termination of his

R-status. *Id.*; **Doc. 12 at 2.**

On June 5, 2023, Plaintiffs filed a complaint in federal court against the agencies,

consulates, and unnamed consular officers responsible for denying Mr. Green's visa, claiming

injunctive relief under the Religious Freedom Restoration Act ("RFRA"), the Administrative

Procedure Act (the "APA"), and the Declaratory Judgment Act (the "DJA"). **Docs. 1, 2.** On

August 07, 2023, the United States filed an opposed Motion to Dismiss under Rules 12(b)(1) and

12(b)(6). **Doc. 12.** The Plaintiffs request the Court to issue a declaratory judgment (1) finding

that the denial of Mr. Green's R-1 visa was unlawful because it burdens the Plaintiffs' sincere

exercise of religion; (2) ordering the Defendants to reopen and adjudicate Mr. Green's R-1 visa

properly under RFRA; and (3) granting attorney's fees or any other relief the Court finds proper.

**Doc. 1 at 20.**

---

application for a B-2 visa, or informs an immigration officer at the port of entry (POE), that the purpose of their visit is tourism, or to visit relatives, etc., and then violates such status by:

      (1) Actively seeking unauthorized employment and, subsequently, becomes engaged in such employment;
      (2) Enrolling in a program of academic study without the benefit of the appropriate change of status;
      (3) Marrying and taking up permanent residence; or
      (4) Undertaking any other activity for which a change of status or an adjustment of status would be required, without the benefit of such a change or adjustment." **Doc. 1-2.**

[6] "In this case, based on the totality of information available, including statements made by your client, the consular officer determined that your client misrepresented his purpose of travel to immigration officials at a port of entry on April 9, 2022, when he entered the United States using a B-1/B-2 visa. Specifically, the consular officer determined that your client misrepresented his purpose of travel as one commensurate with a B-1/B-2 visa when, in fact, he intended to engage in unauthorized employment for hire while in the United States as an independent contractor, which is not permissible on a B-2 visa. Therefore, under INA Section 212(a)(6)(C)(i), your client made [a] material misrepresentation to an immigration officer about the purpose of his travel to the United States." **Doc. 1-2 at 1.**

**LEGAL STANDARD**

The Plaintiffs bring their Complaint under the Administrative Procedure Act (the "APA"), the Religious Freedom Restoration Act (the "RFRA"), and the Declaratory Judgment Act (the "DJA"). *See generally* **doc. 1.**

**1.  Religious Freedom Restoration Act**

RFRA prohibits the federal government from substantially burdening any person's religious exercise without demonstrating that the burden is the least restrictive means of furthering a compelling government interest. *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020); 42 U.S.C. §§ 2000bb; 2000bb-1(a)-(b). Under RFRA, a person is defined as "both an individual or an organization, including corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014).

Courts have found that nonresident aliens do not qualify as protected persons under RFRA. *See Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (noting that RFRA's protections do not extend to Guantanamo detainees because Congress did not intend to protect nonresident aliens under RFRA); *Rasul v. Myers*, 563 F.3d 527, 532 (D.C. Cir. 2009) (reasoning that Congress intended to define "person" consistently with the Supreme Court's understanding of similar constitutional provisions at the time of RFRA's enactment, indicating that the term does not encompass nonresident aliens); *Allaithi v. Rumsfeld*; 753 F.3d 1327, 1334 (D.C. Cir. 2014).[7] *Cf. O Centro Esperita Beneficiente Uniao Do Vegetal v. Duke*, 286 F. Supp. 3d 1239,

---

[7] The D.C. Circuit cases are the only appellate cases this Court could find on the applicability of RFRA to nonresident aliens. The D.C. Circuit examined RFRA's legislative history for evidence that nonresident aliens are not "persons" protected by the statute. *See* 42 U.S.C. § 2000bb(a)(4) ("The Congress finds that in *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion); *Rasul*, 563 F.3d at 532 ("In enacting RFRA, Congress intended to incorporate the standard governing free exercise claims that prevailed before the Supreme Court's 1990 decision in *Employment Division v. Smith*, 494 U.S. 872 (1990)."). After Congress passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), it amended RFRA's definition of the exercise of religion from "the exercise of religion under the First Amendment" to "any exercise of religion, whether

1258-59 n.11 (D.N.M Dec. 15, 2017) (finding that a noncitizen, already present within the United States, has standing to bring a RFRA claim).

A RFRA claimant must first assert a *prima facie* case by showing that a government action substantially burdens the exercise of their sincere religious belief. *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). A sincerely held religious belief is based on a claimant's particular beliefs rooted in their specific religious practice, which need not be "acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protections." *Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 716 (1981); *Abdulsaheeb v. Calbone*, 600 F.3d 1301, 1314 (10th Cir. 2010) ("[T]he issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens Mr. Abdulsaheeb's own exercise of his sincerely held religious beliefs."). Courts, therefore, defer to the RFRA claimant's statement of belief so long as that belief is sincerely held. *Iglesia Pentecostal Casa De Dios Para Las Naciones, Inc. v. Duke*, 718 Fed. Appx. 646, 651 (10th Cir. 2017) (unpublished); *Burwell*, 573 U.S. at 725 ("[I]t is not for us to say that their religious beliefs are mistaken or insubstantial. Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction.") (quotations and internal citations omitted).

---

or not compelled by, or central to, a system of religious belief." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 695-96 (2014); 42 U.S.C. §§ 2000cc, 2000bb-2(4)(1994 ed.), 2000cc-5(7)(A). When enacting RLUIPA, however, Congress did not expand the scope of "person" to include nonresident aliens. *See* 42 U.S.C § 2000cc-1 (expanded the protections of RFRA to persons residing in or confined to a correctional institution but no other classes of people).

The purpose of RFRA is to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). The D.C. Circuit concluded that Congress "legislated against the background of precedent establishing that nonresident aliens were not among the persons protected by the Fifth Amendment and were not among the people protected by the Fourth Amendment." *Rasul*, 563 F.3d at 533 (internal quotations and citations omitted); *Johnson v. Eisentrager*, 339 U.S. 763, 783-84 (1950) (finding that the protections of the Fifth Amendment do not extend to aliens outside the sovereign territory of the United States); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (finding that Fourth Amendment protections only apply to the "people," which excludes nonresident aliens).

 A substantial burden is measured by the intensity of the coercion applied by the government to act in contradiction with a person's sincerely held belief. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir. 2013) ("Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."). A government act imposes a substantial burden on religious exercise if it (1) requires religious participation in an activity prohibited by a sincerely held religious belief; (2) prevents participation in conduct motivated by a sincerely held religious belief; or (3) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief. *Hobby Lobby Stores*, 723 F.3d at 1138; *Abdulsaheeb*, 600 F.3d at 1315. Even where the compulsion is indirect, infringement upon the free exercise of religion can be substantial. *See United States v. Lee*, 455 U.S. 252, 254 (1981).

Once a claimant has made a *prima facie* RFRA claim, the burden shifts to the government to demonstrate that the burden on the claimant is the least restrictive means of advancing a compelling government interest. *Gonzales*, 546 U.S. at 428. In doing so, the trial court must look past "broadly formulated interests justifying the general applicability of government mandates and scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431; *Hobby Lobby Stores*, 723 F.3d at 1143. Finally, the identified government interest must be narrowly tailored to the particular claimant. *Gonzales*, 546 U.S. at 430; *Hobby Lobby*, 723 F.3d at 1143.

## 2. Doctrine of Consular Nonreviewability

The doctrine of consular nonreviewability is the general bar on a trial court's ability to review a consular officer's decision to issue or withhold a visa. *Kerr v. Polis*, 20 F.4th 686, 729 (10th Cir. 2021) (Briscoe, J. concurring in part) (citations and quotations omitted); *Yafai v.*

*Pompeo*, 912 F.3d 1018, 1021 (7th Cir. 2019) ("Congress has delegated the power to determine

who may enter the country to the Executive Branch, and courts generally have no authority to

second-guess the Executive's decisions."); *Baaghil v. Miller*, 1 F.4th 427, 432 (6th Cir. 2021)

(the consular nonreviewability doctrine is a 'no-trespass rule' under which courts rarely second

guess the consular decisions to deny or grant applications); *Centeno v. Schultz*, 817 F.2d 1212,

1214 (5th Cir. 1987) ("This result is in accord with our prior holdings that decisions of United

States consuls on visa matters are nonreviewable by the courts."). While no provision in the

Immigration and Naturalization Act (the "INA") prohibits judicial review of consular decision-

making, visa denials are uniquely political, implicate relations with foreign powers, and involve

classifications defined in the light of changing political, geopolitical, or economic circumstances.

*Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018); *Del Valle v. Sec. of State*, 16 F.4th 832, 838

(11th Cir. 2021).

Consular nonreviewability, therefore, is a judicially created limitation—out of respect to

the separation of powers—on the review of consular visa decisions. *Baaghil*, 1 F.4th at 432

("This allocation of authority to the First and Second Branches over visa applications rarely

permits the Third Branch to police the decisions."); *Allen v. Milas*, 896 F.3d 1094, 1101 (9th Cir.

2018) (the doctrine of consular nonreviewability is judicial in origin, informed by the separation

of powers, and is a deferential form of review that goes to the court's willingness, not its power,

to examine visa denials); *Sesay v. United States*, 984 F.3d 312, 316 (4th Cir. 2021) ("The

Supreme Court has unambiguously instructed that absent some clear directive from Congress or

an affirmative showing of bad faith, the government must simply provide a valid ineligibility

provision as the basis for a visa denial."); *Del Valle*, 16 F.4th at 838 ("The doctrine [of consular

nonreviewability] is, however, judicially created. It is not the consequence of legislation that divests federal courts of jurisdiction.").

Congress delegated exclusive power to grant or deny visas to consular officers in the INA.[8] *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999); *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1025 (D.C. Cir. 2021). Unadmitted and nonresident visa applicants have no right of entry to the United States and no legal recourse to challenge their denial of admission into the country. *Kerry v. Din*, 576 U.S. 86, 88 (2015) (plurality) ("But because Beraksh is an unadmitted and nonresident alien, he has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission."); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("It is clear that Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise."); *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) ("It is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution.").

One narrow exception to the judicial bar on reviewing visa refusals is where it may burden the constitutional rights of a United States citizen. *See Hawaii*, 138 S. Ct. at 2149; *Allen*,

---

[8] *See, e.g.,* 8 U.S.C. § 1104(a) ("The Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality relating to (1) the power, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas…") (emphasis added); 8 U.S.C. § 1201(a)(1) ("A consular officer may issue … (B) to a nonimmigrant who has made proper application…"); 8 U.S.C. § 1201(g) ("No visa or other documentation or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations…"); 8 U.S.C. § 1361 ("If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not inadmissible under any provision of this chapter."); 22 C.F.R. § 41.121(a) ("When a visa application has been properly completed and executed in accordance with the provisions of the INA and implementing regulations, the consular officer must issue the visa, refuse the visa, or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.").

869 F.3d at 1097. Under these circumstances, however, the court's review is narrowly tailored to whether the denial was based on "a facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 770. A consular officer's decision is facially legitimate and bona fide if the officer identifies a valid statute of inadmissibility and makes the necessary factual findings on which the statute is predicated. *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment); *Yafai*, 912 F.3d at 1020; *Hawaii*, 138 S. Ct. at 2419 ("[T]he Government need only provide a statutory citation to explain a visa denial.").

Under the facially legitimate and bona fide standard, the consular officer must only articulate *some* individualized facially legitimate and bona fide reason for denying the visa and *some* factual basis for that decision in each case. *Marczak v. Greene*, 971 F.2d 510, 517-518 (10th Cir. 1992) (emphasis in original). If the visa denial is based on a facially legitimate reason, courts must not look behind the exercise of the consular officer's discretion nor balance the reasons for denial against the constitutional rights of United States citizens. *Hawaii*, 138 S. Ct. at 2149; *Kerry v. Din*, 576 U.S. 86, 105 (2015) (Kennedy, J. concurring in judgment) ("Absent an affirmative showing of bad faith on the part of the consular officer… *Mandel* instructs us not to "look behind" the Government's exclusion … for additional factual details.").

Under *Din*, a court may probe further into a consular officer's refusal where a plaintiff makes an affirmative showing of bad faith by the consular officer. *See id.* An affirmative showing of bad faith may be demonstrated by evidence of the consular officer's subjective bad faith, the objective unreasonableness of the visa denial, or where the consular officer acted on information it knew to be false. *Khachatryan v. Blinken*, 4 F.4th 841, 852-53 (9th Cir. 2021) (finding bad faith at the pleading stage where the consular officer's visa refusal was based on allegations of visa fraud but did not consider USCIS' finding on three separate occasions that the

Plaintiff had not committed that fraud). However, bad faith is not shown by an officer's honest assessment that an applicant's testimony and documentation were not credible or a plaintiff's conclusory allegations that a factual determination led to an unfavorable decision. *See Yafai*, 912 F.3d at 1022; *Khachatryan*, 4 F.4th at 853-54; *Sesay*, 984 F.3d at 316-17. Courts have inferred a lack of bad faith from a consular officer's requests for additional documentation, the length of proceedings, "back and forth" between the officer and the applicants, and a consular officer's willingness to reconsider a visa application with additional evidence. *See Sesay*, 984 F.3d at 317; *Yafai*, 912 F.3d at 1022.

Courts have extended the doctrine of consular nonreviewability to plaintiffs' requests for judicial review of visa refusals under the APA and DJA.[9] *Allen*, 896 F.3d at 1108-9 (finding that the APA provides no avenue for review of a consular officer's adjudication of a visa on the merits); *Saavedra Bruno*, 197 F.3d at 1160 (under APA § 701(a)(1), immigration laws "preclude judicial review" of consular visa decisions, and that the doctrine of consular nonreviewability is a limitation on judicial review under APA § 702); *Khachatryan*, 4 F.4th at 849 ("Although Congress could conceivably create by statute some mechanism for review of individual consular decisions, it has not seen to take any such action to displace the rule of consular

---

[9] The Administrative Procedure Act grants federal courts the authority to conduct narrow reviews over agency decisions. 5 U.S.C. § 702; *Judalang v. Holder*, 565 U.S. 42 (2011). In doing so, a reviewing court may set aside agency actions that are arbitrary, capricious, an abuse of discretion, or exceed the agency's statutory authority. 5 U.S.C. § 706(2)(A)-(C). A federal court, however, may not review an agency's action (1) where a statute precludes judicial review or (2) where an agency action is committed to agency discretion by law. 5 U.S.C. § 701(a)(1)-(2). Further, nothing in the APA "affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702.

     The Declaratory Judgement Act states, "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). The DJA does not provide any substantive rights but rather provides a procedure empowering federal courts to declare—within its discretion—the legal rights of adversaries engaged in a justiciable controversy. *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937); *Ala. State Fed'n of Labor v. McAdory*, 325 U.S. 450, 462 (1945).

nonreviewability."); *Morfin v. Tillerson*, 851 F.3d 710, 712 (7th Cir. 2017) (finding that courts,

for more than a century, have treated visa decisions as discretionary decisions not subject to

judicial review under administrative law); *Baaghil*, 1 F.4th at 434 ("The doctrine of consular

nonreviewability predates the passage of the APA and amounts to one such limitation on judicial

review that supersedes the APA's general authority to challenge a "legal wrong" caused by the

national government."). Courts have also declined to make a declaratory judgment about the

soundness of a consular officer's visa adjudication because to do so would necessarily require a

court to look behind a consular official's decision, violating the doctrine of consular

nonreviewability. *See Yafai*, 912 F.3d at 1023; *Sesay*, 984 F.3d at 317; *Schilling v. Rogers*, 363

U.S. 666, 677 (1960) ("the Declaratory Judgments Act is not an independent source of federal

jurisdiction; the availability of such relief presupposes the existence of a judicially remediable

right."); *Baan Rao Thai*, 985 F.3d at 1025.

## DISCUSSION

### I.     Plaintiffs' Motion for Injunctive Relief (Doc. 2)

Plaintiffs request the Court to order the Defendants to reconsider the Plaintiff's R-1 visa

in conformity with the RFRA within fourteen days of the Court's order and grant injunctive

relief through a temporary restraining order (TRO) or preliminary injunction. **Doc. 2 at 20.**

The purpose of a TRO is to prevent a plaintiff from suffering irreparable harm before a

court can decide whether a preliminary injunction is warranted. *Miller v. Lipinski*, No. 20-CV-

02600-CMA-MEH, 2020 WL 5096018, at *1 (D. Colo. Aug. 28, 2020). A plaintiff's "delay in

requesting a TRO militates against its issuance." *Id.*; *O.L. v. City of El Monte*, No. 2:20-cv-

00797-RGK-JDE, 2020 WL 2477686, at *2 (C.D. Cal. Mar. 2, 2020); *Mbaku v. Bank of Am.,*

*Nat. Ass'n*, No. 12-cv-00190- 2012 WL 263095, at *1 (D. Colo. Jan. 30, 2012) (citing *Wangson*

*Biotechnology Group, Inc. v. Tan Tan Trading Co., Inc.*, 2008 WL 4239155, at *6 (N.D. Cal. Sep.11, 2008). This Court previously found that "there is no immediate threat to the Plaintiff" because Plaintiffs delayed filing their complaint by several months. **Doc. 11 at 1.** Accordingly, the Court again finds that the Plaintiffs' delay in filing their complaint militates against the issuance of a TRO and denies the Plaintiffs' request for a TRO. *See Miller*, 2020 WL 5096018 at *1. The Court will next consider the Plaintiffs' request for a preliminary injunction.

**A. Legal Standard for Preliminary Injunctive Relief**

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a hearing or trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L.Ed.2d 175 (1981). When issuing a preliminary injunction, a court primarily preserves its power to render a meaningful decision on the merits. *Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003). Because a preliminary injunction is an extraordinary remedy—the exception rather than the rule—the movant's right to relief must be clear and unequivocal. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019); *Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (citations omitted).

To obtain a preliminary injunction, a party must demonstrate that (1) they are substantially likely to prevail on the merits; (2) they will suffer irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)). The party seeking the injunction must demonstrate that they meet each factor independently. *See*

*Aposhian v. Barr*, 958 F.3d 969, 989 (10th Cir. 2020); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222. When the government is the opposing party, the third and fourth factors "merge." *Aposhian*, 958 F.3d at 978 (10th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

 Courts disfavor preliminary injunctions that change the parties' relative positions pending trial and, therefore, require more from the parties who request them. *Free the Nipple*, 916 F.3d at 797 (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005)) ("[A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win."). To obtain a "disfavored" preliminary injunction, the moving party must make a strong showing that the likelihood-of-success-on-the-merits and the balance-of-harms factors tilt in their favor. *Free the Nipple*, 916 F.3d at 797. The heightened standard does not affect the analysis of the other two preliminary injunction factors: irreparable injury and public interest. *Awad v. Ziriax*, 670 F.3d 1111, 1126 (10th Cir. 2012).

**B.  The Plaintiffs have not met their burden for injunctive relief because they cannot successfully demonstrate any preliminary injunction factors.**

 To obtain a preliminary injunction, the Plaintiffs must demonstrate: (1) that they have a substantial likelihood of prevailing on the merits despite the doctrine of consular nonreviewability; (2) that the Plaintiffs will suffer irreparable harm unless the Court orders the consular officer to re-adjudicate the visa under RFRA; (3) that their threatened injuries under RFRA outweigh any harm that a preliminary injunction may cause to the government Defendants; and (4) the injunction, if issued, will not adversely affect the public interest. ***See doc. 2***; *Diné Citizens*, 839 F.3d at 1281. The Court will apply the disfavored injunctive relief standard because the Plaintiffs request this Court to order the readjudication of Mr. Green's visa

under RFRA, relief that alters the status quo. *See Free the Nipple*, 916 F.3d at 797; **Docs. 13 at 2; 2 at 14.** So, the Plaintiffs must show that there is a strong likelihood that they will succeed on the merits and that the balance of harms tilts in their favor. *Free the Nipple*, 916 F.3d at 797; *Awad*, 670 F.3d at 1126.

> 1. **The doctrine of consular nonreviewability precludes judicial review of the consular officer's adjudication of Mr. Green's visa, significantly limiting the Plaintiffs' likelihood of success on the merits.**

Plaintiffs argue that they have a substantial likelihood of success on the merits because they have made a *prima facie* RFRA case—that the consular officer's denial of Mr. Green's visa substantially burdened their choice of minister and how they choose to compensate their ministers. **Doc. 17 at 2.** The Plaintiffs additionally contend that RFRA supersedes the doctrine of consular nonreviewability because "[b]y enacting RFRA, Congress in effect amended the INA to allow suits against consulate or USCIS when they violate religious rights." **Doc. 16 at 8.**

 In response, the Defendants argue that the doctrine of consular nonreviewability generally precludes this Court from interfering with the factual decision-making of a consular officer. **Doc. 12.** The Defendants argue that (1) the Plaintiffs have no standing to challenge the decision of the consular officer; (2) consular nonreviewability precludes the Court from granting the relief requested under RFRA, the APA, and the DJA; and (3) even if consular nonreviewability did not apply, the Plaintiffs' claims fail under RFRA itself. **Doc. 21 at 1.** The Court finds that the Plaintiffs cannot meet the heightened "disfavored" injunction standard based on the doctrine of consular nonreviewability. *See Free the Nipple*, 916 F.3d at 797; *Aposhian*, 958 F.3d at 989.

The Plaintiffs bring their free exercise claims under RFRA, not the First Amendment, so this Court will not assess whether the Plaintiffs successfully made a constitutional Free Exercise

claim. **See doc. 1 at 18.** This Court must first consider whether RFRA protects the Plaintiffs in this case. *See* 42 U.S.C. § 2000bb-1. Plaintiff Calvary Church, a religious organization based in the United States, is a "person" protected by RFRA. *See Burwell*, 134 S. Ct. at 2768; 42 U.S.C. § 2000bb-1.

In contrast, the remaining Plaintiffs, as noncitizens located outside the United States, are unlikely to succeed in bringing a RFRA claim. *See Aamer*, F.3d at 1043; *Rasul*, 563 F.3d at 532; 42 U.S.C. § 2000bb. Here, the Court finds the D.C. Circuit's reasoning persuasive: (i) the term 'person' as used in RFRA should be read in line with similar language in constitutional provisions because RFRA is analogous to a constitutional right; (ii) the Supreme Court has repeatedly declined to extend other constitutional privileges to nonresident aliens; and (iii) when Congress amended RFRA with RLUIPA, it did not extend RFRA's protections to nonresident aliens. *See id.*; *Hobby Lobby Stores*, 723 F.3d at 1145-46; *Burwell*, 573 U.S.at 695-96; 42 U.S.C. § 2000cc; § 2000bb-2(4) (1994 ed.); § 2000cc-5(7)(A). Because Mr. Green and his family were outside of the United States at the time of the alleged RFRA violation—his R-1 visa denial, the protections of RFRA did not extend to him or his family members. *See Allaithi*, 753 F.3d at 1334.

The doctrine of consular nonreviewability is clear—it permits this Court to disturb the consular officer's decision to deny Mr. Green's R-1 in two narrow circumstances: (1) when Congress explicitly permits judicial review or (2) when the consular officer's decision implicates the constitutional rights of a United States citizen and where the claimant affirmatively demonstrates bad faith. *See Sesay*, 984 F.3d at 316; *Baan Rao Thai*, 985 F.3d at 1025; *Hawaii*, 138 S. Ct. at 2149. Neither exception applies here. While Congress has the authority to allow judicial oversight over visa approvals, denials, and revocations in the face of the doctrine of

16

consular nonreviewability, it has not yet explicitly amended the INA to allow judicial review of visa refusals. *See Del Valle*, 16 F.4th at 838; *Baan Rao Thai*, 985 F.3d at 1025. Instead, Congress has consistently delegated the exclusive power to grant or deny a visa to consular officials. *See* 8 U.S.C. § 1104(a); 8 U.S.C. § 1201(a)(1); 8 U.S.C. § 1201(g); 8 U.S.C. § 136; *Saavedra Bruno*, 197 F.3d at 1156.

RFRA, while providing "very broad protections for religious liberty," is still subject to overarching and long-standing federal legal principles, like the doctrine of consular nonreviewability. *See, e.g., Hobby Lobby Stores*, 723 F.3d at 1128 (applying the Supreme Court's preliminary injunction test to the plaintiff's RFRA claim); *Hawaii*, 138 S. Ct. at 2149 (stating that the consular nonreviewability's "deferential standard of review" has been applied "across different contexts and constitutional claims"). RFRA applies to any application of federal statutory law that substantially burdens sincere religious exercise, but context-specific judicial doctrines constrain what is "appropriate relief" under RFRA. *See Ajaj v. Fed. Bureau of Pris.*, 25 F.4th 805, 813-16 (10th Cir. 2022) (finding that a court may apply "background presumptions" to RFRA based on policy considerations if those background presumptions were well-established when RFRA was enacted); *Tanzin*, 141 S. Ct. at 491 (RFRA provides a right to seek "appropriate relief," language that is "open-ended" and "inherently context-dependent."); 42 U.S.C. § 2000bb-1(c).

Therefore, the doctrine of consular nonreviewability—a long-standing background legal presumption well-established at the time of RFRA's enactment—determines the scope of appropriate relief under RFRA. *See id.* Even though courts have applied RFRA to final immigration decisions based on an INA statutory provision (for example, USCIS decisions to deny R-1 petitions), this Court found no cases applying the RFRA analysis to a consular officer's

17

decision to deny a visa.[10] *See, e.g., O Centro*, 286 F. Supp. 3d at 1239; *National Capital Presbytery v. Mayorkas*, 567 F. Supp. 230 (D.D.C. Oct. 19, 2021); *Tenacre Foundation v. INS*, 78 F.3d 693 (D.C. Cir. 1996); *Iglesia Pentecostal*, 718 Fed. Appx. at 649-52. Therefore, the Plaintiffs' claim that RFRA was Congress' way of permitting judicial review into consular visa decisions is not supported by caselaw or RFRA's text. *See id*; *Tanzin*, 141 S. Ct. at 491; *Ajaj*, 25 F.4th at 813-16; 42 U.S.C. § 2000bb-1(c).

The Supreme Court treats the doctrine of consular nonreviewability as so fundamental to the structural division of power between the branches of government that it allows for only "circumscribed" judicial review of consular decisions to deny a visa. *Hobby Lobby Stores*, 723 F.3d at 1146; *Hawaii*, 138 S. Ct. at 2149; *Din*, 576 U.S. at 104 (Kennedy, J., concurring in judgment). Because the doctrine of consular nonreviewability is a long-standing "no trespass rule" for judicial review, and Congress has not expressly provided for judicial review of consular visa decisions, this Court may not infringe upon the consular officer's decision to deny Mr. Green's visa except where the constitutional rights of an American citizen are implicated. ***See doc. 16 at 16-17***; *Baaghil,* 1 F.4th at 432*; Mandel*, 408 U.S. at 770.

Next, the Court turns to whether the consular officer's decision implicates the constitutional rights of an American citizen. ***See doc. 16 at 17***; *Hawaii*, 138 S. Ct. at 2149. Mr. Green and his family are not United States citizens and are currently in South Africa. **Doc. 1 at**

---

[10] Plaintiffs rely on two district court cases to support their claims that RFRA protects a church's decision on how to compensate foreign-born ministers despite the statutory compensation requirements present in the R-1 visa process. ***See* Doc. 2 at 15**; *O Centro*, 286 F. Supp. 3d 1239; *National Capital Presbytery*, 567 F. Supp. 230. Those courts applied RFRA to USCIS denials of a religious institution's R-1 petitions based on the compensation requirement, a requirement rooted in statutory and regulatory law. 8 U.S.C. §§ 1101(a)(15)(R)-(i), 1101(a)(27)(C)(ii); 8 C.F.R. §§ 204.5(m), 214.2(r),(11). *See O Centro*, F. Supp. at 1263-64 (finding that USCIS' denial of the plaintiffs' petition to renew an R-1 visa based on the noncompensation of ministers was likely a substantial burden on the plaintiffs' sincerely held religious beliefs); *National Capital Presbytery*, 567 F. Supp. at 244-46 (finding a RFRA violation where the USCIS' denial of the plaintiffs' petition to renew an R-1 visa was based on the structure of the proposed compensation). These cases did not apply to a consular officer's denial of an R-1 visa, and therefore do not implicate the doctrine of consular nonreviewability. *See Iglesia Pentecostal*, 718 Fed. Appx. at 649-52.

**7, 18.** As noncitizens not currently on United States territory, they have no cause of action to challenge the denial of their R-1 visas and have no likelihood of succeeding on the merits of a consular nonreviewability claim. *See Din*, 576 U.S. at 88 (plurality); *Mandel*, 408 U.S. at 762; *Agency for Int'l Dev.*, 140 S. Ct. at 2086; *Free the Nipple*, 916 F.3d at 797. The only remaining plaintiff is Calvary Church, which claims that the consular officer's decision interferes with its internal governance—particularly in choosing its ministers—in violation of RFRA. **Doc. 1 at 1, 7, 10.** Even though the Plaintiffs assert a constitutional free exercise claim under RFRA, RFRA is statutory. **See doc. 2 at 18**; 42 U.S.C. § 2000bb-1(c). However, because the Tenth Circuit analogizes RFRA claims to constitutional claims, this Court will review Calvary Church's under the narrow exception described in *Mandel. See* 408 U.S. at 762; *Hobby Lobby Stores*, 723 F.3d at 1145-46.

Calvary Church is a United States church making a free exercise claim under RFRA, so this Court must next determine whether the consular officer's visa denial was made for a facially legitimate and bona fide reasons. *See Mandel*, 408 U.S. at 762, 770. As an initial matter, the parties disagree on whether the visa denial was based on Mr. Green's failure to overcome his presumption of immigrant status and misrepresentation or just misrepresentation.[11] ***See generally docs. 1, 12, 16.*** The Plaintiffs argue that Mr. Green's visa was denied solely on misrepresentation grounds and that he overcame his presumption of immigrant status after his

---

[11] The Tenth Circuit has held that where an individual would have been denied a benefit because they failed to satisfy lawful, nondiscriminatory qualifications for the benefit, the individual lacks standing to challenge the denial of the benefit. *See Day v. Bond*, 500 F.3d 1127, 1134 (10th Cir. 2007); *Wilson v. Glenwood Intermountain Props.*, 98 F.3d 590, 594 (10th Cir. 1996); *Fuller v. Norton*, 86 F.3d 1016, 1027 (10th Cir. 1996). Therefore, if Mr. Green's visa denial was based on both misrepresentation and failing to overcome his presumption of immigrant status, the Plaintiffs' arguments centering around the consular officer's improper application of the misrepresentation standard, or the 90-day rule would be irrelevant. *See Wilson*, 98 F.3d at 594; *Day*, 500 F.3d at 1134. This is because the consular officer had an independent facially legitimate and bona fide reason for denying the visa—that Mr. Green had not overcome his presumption of immigrant status. **See doc. 12 at 9**; 8 U.S.C. § 214(b). The Plaintiffs have not made any arguments challenging the consular officer's decision-making under § 214(b), except to suggest that Mr. Green had overcome this presumption. **Doc. 1 at 16.**

second and third interviews with the Johannesburg consular officer. **Doc. 1 at 16**; 8 U.S.C. § 214(b). As evidence of this, Plaintiffs point to the last Refusal Worksheet Mr. Green received on January 19, 2023, which informed him that he was refused a visa under "Section 212(a)(6)(C)(1) – Misrepresentation" with no mention of the presumption of immigrant status. **Doc. 17-1.**

In response, Defendants argue that there is no evidence that Mr. Green overcame his presumption of immigrant status and that the denial was based on both statutory bases as confirmed by the LegalNet advisory opinion. **Doc. 12 at 9-10.** While the Court suspects that the LegalNet opinion contains the most complete and accurate record of Mr. Green's visa adjudication, the Court does not have enough information to determine the entire basis of Mr. Green's denial at this stage of litigation. ***See* doc. 1-2.** Since both parties agree that the denial was based at least partially on misrepresentation, the Court will analyze the Plaintiff's likelihood of success on the merits based solely on the misrepresentation basis. ***See id; Free the Nipple***, 916 F.3d at 797.

Presuming that the visa denial was based solely on Mr. Green's misrepresentation, the Plaintiffs still have a low likelihood of success under the consular nonreviewability doctrine. *See Free the Nipple*, 916 F.3d at 797. Plaintiffs contend that the consular officer found no evidence that Mr. Green actually misrepresented the purpose of his visit to a border official but instead applied a presumption of misrepresentation under the Foreign Affairs Manual's 90-day rule. 9 FAM § 302.9-4(B)(3)(g)(2); **doc. 16 at 12.** Plaintiffs argue that the consular official applied the 90-day rule in "harsh and restrictive ways" by wrongly determining that Mr. Green intended to engage in unauthorized employment as an independent contractor while on his B-1/B-2 visa. **Doc. 16 at 12.** The doctrine of consular nonreviewability, however, bars this court from inquiring beyond whether the consular officer made a facially legitimate and bona fide reason for

the denial. *Mandel*, 408 U.S. at 770; *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment); *Yafai*, 912 F.3d at 1020; *Marczak*, 971 F.2d at 517-18.

Here, the consular officer cited a valid statutory reason for denial—8 U.S.C. § 212(a)(6)(C)(i)—and provided plausible factual circumstances under which Mr. Green made his material misrepresentation to a border officer. ***See docs. 1-2; 16-1; 16-2***; *Matsushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017); *Yafai*, 912 F.3d at 1020; *Hawaii*, 138 S. Ct. at 2419. Applying the 90-day rule, the consular officer made a factual determination that Mr. Green willfully misrepresented the purpose of his April 9, 2022, visit to a border official as commensurate with a B-1/B-2 visa and then violated that status by intending to engage in unauthorized employment for hire as an independent contractor at Calvary Church within 90-days of his entry into the United States. ***See doc. 2-2***; 9 FAM § 302.9-4(B)(3)(g)(2)(U)(a). This determination was based on Mr. Green's testimony and the extensive documentation Mr. Green provided to the consular officer. ***See docs. 2-2; 1 at 16-17.*** The Plaintiffs construe the 90-day rule as a "presumption of misrepresentation," but the record suggests that the consular officer provided Mr. Green with opportunities to rebut this presumption through two additional interviews focused on Mr. Green's payments, letters from Mr. Green's counsel explaining why his activities complied with B-1/B-2 status, his activities at Calvary Church, and the documentation of the monetary compensation made by Calvary Church to Mr. Green. ***See doc. 1 at 15-16***; 9 FAM § 302.9-4(B)(3)(h).

The *Mandel* standard merely requires that the consular officer articulate *some* individualized facially legitimate and bona fide reason for denying a visa, which the consular officer did by citing the misrepresentation standard. ***See doc. 16-1; 2-2***; *Mandel*, 408 U.S. at 770; *Marczak*, 971 at 517-18. The officer must also provide *some* factual basis for the decision, which

was described in the LegalNet advisory opinion. *See* **doc. 2-2**; *Marczak*, 971 at 517-18; *Yafai*, 912 F.3d at 1020; *Hawaii*, 138 S. Ct. at 2419. The facially legitimate and bona fide standard does not require the consular officer's decision to be entirely correct; it just demands that the consular officer point to some facts in the record that plausibly support his decision to deny the visa. *See Marczak*, 971 at 517-18; *Yafai*, 912 F.3d at 1020; *Hawaii*, 138 S. Ct. at 2419. Because the consular officer did so, this Court may not further examine additional factual details relating to the proper classification of Calvary Church's payments to Mr. Green, whether Mr. Green intended to engage in employment as an independent contractor, or whether the consular officer correctly applied Foreign Affairs Manual procedures to this case. *See* **doc. 1 at 15-19; 2-2**; *Marczak*, 971 at 517; *Din*, 576 U.S. at 105 (Kennedy, J. concurring in judgment). Any further intrusion into the consular officer's factual determination would transform this narrow exception to the doctrine of consular nonreviewability into a full judicial review of the case. *See Matsushkina*, 877 F.3d at 295-96; *Mandel*, 408 U.S. at 770; *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment).

Next, the Plaintiffs assert that the consular officer showed bad faith in denying Mr. Green's visa, which allows a more robust judicial review under *Din*. *See* 576 U.S. at 105 (Kennedy, J., concurring in judgment); **docs. 1 at 17; 16 at 17-18**. The Plaintiffs have a low likelihood of success on the merits here, too, because they are required to make an affirmative showing of bad faith—for example, where the Plaintiff can affirmatively show the officer's subjective bad faith, where the denial was objectively unreasonable, or where the officer relied on information he knew to be false. *See* **doc. 16 at 18**; *Khachatryan*, 4 F.4th at 852-53; *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment); *Yafai*, 912 F.3d at 1022; *Free the Nipple*, 916 F.3d at 797. The Plaintiffs have not made the threshold affirmative showing of bad faith that

22

would allow this Court to conduct a more robust review of the consular officer's decision. *See Khachatryan*, 4 F.4th at 852-53. First, the Plaintiffs concede that they cannot show the officer's subjective bad faith because they do not know the consular officer's internal thought process when denying the visa. *See id.*; **doc. 16 at 18.**

Second, the Plaintiffs argue that Mr. Green provided strong evidence that he was allowed to accept an allowance from Calvary Church but that the consular officer, in bad faith, refused to consider the evidence presented in its entirety. ***See* Doc. 16 at 18.** But the record shows that Mr. Green was afforded two opportunities to provide additional information and testimony on the matter, including a letter from his attorney detailing why the allowance was allowed under B-1/B-2 visa. ***See* doc. 1 at 16; 16 at 18** ("[T]he whole content of the conversations between Mr. Green and the Unknown Consular Officer in Cape Town and the Unknown Consular Officer in Johannesburg centered around if and how Mr. Green was "paid" prior to R-1 approval."). The fact that Mr. Green did not receive a favorable outcome or that the consular officer did not believe the evidence he presented is not evidence of the consular officer's dishonest or illicit motive. *See Yafai*, 912 F.3d at 1022.

Third, the Plaintiffs cannot show that Mr. Green's visa denial was objectively unreasonable. *See Khachatryan*, 4 F.4th at 852-53. The consular officer relied upon Mr. Green's statements that he had accepted monetary compensation from Calvary Church—something generally not permitted under a B-1/B-2 visa—and reasonably applied the Foreign Affairs Manual's 90-day rule to Mr. Green's statements to the border official. ***See* doc. 1 at 15;** 22 C.F.R. § 41.31. After using the 90-day rule, the consular officer then reasonably concluded that Mr. Green had materially misrepresented the purpose of his April 09, 2022, trip as compliant with B-1/B-2 visa status. ***See* doc. 1-2**; *Khachatryan*, 4 F.4th at 853-54. Even if the consular

officer did not follow the appropriate regulations or made the decision based on factual or legal error, that does not demonstrate that the consular officer's decision was objectively unreasonable. *See Burrafato v. Dep't of State*, 523 F.2d 554 (2d. Cir. 1975); *Centeno*, 817 F.2d at 1213.

Finally, Plaintiffs have also not affirmatively shown that the consular officer relied on false information while applying the presumption of misrepresentation. *See Khachatryan,* 4 F.4th at 853-54. Unlike in *Khachatryan*, where the consular officer relied on allegations of marriage fraud that USCIS had discredited three times, Mr. Green honestly and consistently acknowledged that Calvary Church had given him monetary compensation for leading worship services in the months preceding USCIS' approval of Calvary Church's R-1 petition. *See* 4 F.4th at 853; **doc 1 at 16**; **16 at 13**. Despite the Plaintiffs' dispute with how the consular officer classified these payments, these determinations were not made by relying on "objectively false information." *Khachatryan,* 4 F.4th at 853; **doc. 16 at 18**. Instead, the record demonstrates that the officer made those determinations after considering Mr. Green's statements and documentation. ***See*** **doc. 16 at 19-20.**

Therefore, the Plaintiffs have not affirmatively shown the consular officer's subjective bad faith, that the denial was objectively unreasonable, or that the consular officer knowingly relied on false information in his determination. *See Khachatryan*, 4 F.4th at 852-53; *Yafai*, 912 F.3d at 1022. Far from indicating bad faith, the record indicates that the consular officer acted in good faith by participating in three interviews and considering the additional information provided by Mr. Green. ***See*** **doc. 16 at 17-1**8, *Sesay*, 984 F.3d at 317; *Yafai*, 912 F.3d at 1022. Even if the consular officer misapplied the Foreign Affairs Manual guidance, there is no affirmative indication that the consular officer's determination was based on anything except an

honest assessment of Mr. Green's testimony and documentation. ***See*** **doc. 16 at 17-18**; *Yafai*, 912 F.3d at 1022; *Khachatryan*, 4 F.4th at 853-54; *Sesay*, 984 F.3d at 316-17. Because the Plaintiffs have not made an affirmative showing of bad faith, the doctrine of consular nonreviewability prohibits this Court from further investigating the consular officer's adjudication of Mr. Green's visa. *See Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment).

The Plaintiffs' APA and DJA claims also have a low likelihood of success. *See Free the Nipple*, 916 F.3d at 797. The doctrine of consular nonreviewability acts as a "limitation on judicial review" that confines this Court's ability to review whether a visa refusal is arbitrary and capricious. *See* 5 U.S.C. § 702; *Saavedra Bruno*, 197 F.3d at 1160; *Allen*, 896 F.3d at 1108-9; *Baaghil*, 1 F.4th at 434-35. Further, a consular officer's decision to grant or deny a visa is an agency action committed to discretion by statute and, therefore, not subject to judicial review. 5 U.S.C. § 701(a)(1)-(2); *Saavedra Bruno*, 197 F.3d at 1160; *Morfin*, 851 F.3d at 712; *Baaghil*, 1 F.4th at 434-35. The Court also declines to exercise its discretion to determine parties' legal rights under the DJA. *Kunkel,* 866 F.2d at 1273; *Aetna Life Ins.*, 300 U.S. at 240; *Ala. State Fed'n of Labor*, 325 U.S. at 462. Determining the parties' rights would require this Court to look behind the consular officer's decision to deny Mr. Green's visa denial, a direct violation of the doctrine of consular nonreviewability. *See Yafai*, 912 F.3d at 1023; *Baan Rao Thai*, 985 F.3d at 1025; *Schilling*, 363 U.S. at 677.

Under the disfavored injunction standard, the Plaintiffs must make a strong showing that they are likely to succeed on the merits of the case. *See Free the Nipple*, 916 F.3d at 797. Here, the doctrine of consular nonreviewability has foreclosed the possibility of success on the merits. *See Mandel*, 408 U.S. at 770; *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment). Even

though the Plaintiffs have not demonstrated their likely success on the merits—defeating their request for injunctive relief, this Court will address the remaining preliminary injunction factors. *See Diné Citizens*, 839 F.3d at 1281; *Aposhian*, 958 F.3d at 978, 989. *Urban Gorilla,* 500 F.3d 1222.

### 2. Plaintiffs have not established the remaining factors for injunctive relief.

Plaintiffs "must establish ... that [they are] likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[C]ourts have consistently noted that because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered. Demonstrating irreparable harm is not an easy burden to fulfill." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal citations and quotation marks omitted). The harm "must be both certain and great," and not speculative or "merely serious or substantial." *Id.*: *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001); *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021). Establishing a RFRA violation satisfies the "irreparable harm" factor. *Hobby Lobby Stores*, 723 F.3d at 1146.

Plaintiffs argue that Mr. Green has suffered irreparable harm because he has been unable to perform the functions of his job for several months and that the consular officer's decision limits his ability to practice his religion freely. **Doc. 2 at 17.** Plaintiffs also argue that Calvary Church is suffering irreparable harm because the consular officer's decision deprives the church of its choice of worship minister, a position central to the church that is challenging to fill. ***See docs. 2 at 17; 2-1 at 1.*** Finally, the Plaintiffs contend that their *prima facie* RFRA violation satisfies the irreparable harm factor: the consular officer's decision to deny Mr. Green's visa

substantially burdens their choice of minister and their belief that they must compensate ministers. *See* **doc. 17 at 5**; *Hobby Lobby Stores*, 723 F.3d at 1145-46.

However, as discussed above, the doctrine of consular nonreviewability precludes this Court from reviewing the consular official's visa determination under RFRA. *See Polis*, 20 F.4th at 729 (Briscoe, J. concurring in part); *Baaghil*, 1 F.4th at 432; *Hawaii*, 138 S. Ct. at 2418. Mr. Green and his family, while harmed by the visa denial, do not have a cause of action under RFRA or the Constitution. *See Din*, 576 U.S. at 88 (plurality); *Mandel*, 408 U.S. at 762; *Agency for Int'l Dev.*, 140 S. Ct. at 2086; *Free the Nipple*, 916 F.3d at 797; *Allaithi*; 753 F.3d at 1334; *Aamer*, F.3d at 1043; *Rasul*, 563 F.3d at 532; 42 U.S.C. § 2000bb. Therefore, Mr. Green and his family cannot show they have suffered irreparable harm unless the injunction is granted. *See Potawatomi Indians*, 253 F.3d at 1250; *Heideman*, 348 F.3d at 1190; *Hobby Lobby Stores*, 723 F.3d at 1145-46.

Plaintiff Calvary Church cannot claim that it is irreparably harmed by the Worship Director vacancy. *See* **Doc. 2 at 17**; *Potawatomi Indians*, 253 F.3d at 125. It is true that the consular officer's decision to deny Mr. Green's visa has the practical effect of depriving Calvary Church of its choice of minister. *See* **doc. 2-1** (affidavit by Nathan Heitzig, Chief Pastoral Officer of Calvary Church, explaining that the church has been without a permanent Worship Director since December 2018 because the position has been challenging to fill). Yet, as Mr. Heitzig explains, the Worship Director position was vacant for over three years before Mr. Green arrived at Calvary Church for the first time. *See* **docs. 1 at 2; 2-1.** Therefore, Calvary Church cannot show that it will suffer irreparable harm due to the Worship Director vacancy if this Court denies injunctive relief. *See* **docs. 1 at 2; 2-2;** *RoDa Drilling*, 552 F.3d at 1208-09.

Further, Calvary Church is not otherwise limited from filling its Worship Director position with another candidate, nor is it forced to retain an unwanted minister. *See* **docs. 17-1; 17-2**; *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 188-89 (2012). Calvary Church may continue to compensate ministers however it chooses—the consular officer's visa refusal is based on Mr. Green's misrepresentation, not any activity by Calvary Church. *See* **doc. 2-2.** Therefore, while this visa denial may cause Calvary Church significant difficulty, it has not shown that issuing an injunction would prevent the church from suffering irreparable harm. *See Potawatomi Indians*, 253 F.3d at 1250; *RoDa Drilling*, 552 F.3d at 1208-09.

Because the Defendants are government entities, the Court will address the third and fourth factors—balance of harms and public interest—together. *See Aposhian*, 958 F.3d at 978. The third factor is whether the balance of equities tips in the movant's favor. *RoDa Drilling*, 552 F.23d at 1208. Plaintiffs argue the threatened injury of a RFRA violation and constitutional harm outweighs any administrative harm that the Defendants would suffer through the re-adjudication of Mr. Green's visa application. **Doc. 2 at 18.** Additionally, the Plaintiffs argue that it is always in the public interest to prevent the violation of a party's constitutional rights. ***See*** **Doc. 2 at 19**; *Hobby Lobby Stores*, 723 F.3d at 1147; *Awad*, 670 F.3d at 1132. In response, the Defendants argue that (1) the Plaintiffs have no viable RFRA claim and, therefore, have shown no harm or public interest, and (2) their actions support the public's interest in preventing visa fraud. **Doc. 13 at 5.**

Because the Plaintiffs cannot make either a RFRA or constitutional claim under the doctrine of consular nonreviewability, the balance of equities does not tilt in favor of the Plaintiffs. *See RoDa Drilling*, 552 F.23d at 1208. Any court order to readjudicate Mr. Green's

visa application would cause an administrative burden on consular officials, and the Plaintiffs have shown no threatened injury that would outweigh even a minor administrative inconvenience. *See* **doc. 2 at 18-19;** *RoDa Drilling*, 552 F.23d at 1208; *Din*, 576 U.S. at 104 (Kennedy, J., concurring in judgment). The Defendants argue that the requested injunctive relief would infringe on the public's interest in maintaining the integrity of the nation's visa approval process. **Doc. 13 at 5.** Balanced against a nonexistent RFRA or constitutional violation, preventing immigration fraud is likely a "compelling state interest" that weighs against the Plaintiffs. *See* **docs**. **1 at 3-4**; **13 at 5;** *O Centro*, 286 F.Supp.3d at 1265; *Awad*, 670 F.3d at 1132-33.

The Plaintiffs have failed to demonstrate any of the four injunctive relief factors, let alone the heightened standard for disfavored injunctive relief. *See Diné Citizens,* 839 F.3d at 1281; *Free the Nipple*, 916 F.3d at 797. First, the Plaintiffs have not shown a high likelihood of success on the merits because the doctrine of consular nonreviewability precludes this court from reviewing their claims under RFRA, APA, and DJA. *See Mandel*, 408 U.S. at 762; *Hawaii*, 138 S. Ct. at 2418; *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment); *Free the Nipple*, 916 F.3d at 797. Second, because Mr. Green and his family cannot bring a claim under RFRA, they also cannot show that they will suffer irreparable harm without injunctive relief. *See Allaithi*; 753 F.3d at 1334; *Aamer*, F.3d at 1043; *Rasul*, 563 F.3d at 532; 42 U.S.C. § 2000bb; *Winter*, 555 U.S. at 20. Finally, because the Plaintiffs have not demonstrated a RFRA violation, the balance of harms and public interest in preventing immigration fraud weigh against them. *See Aposhian*, 958 F.3d at 978; *Hobby Lobby Stores*, 723 F.3d at 1147. The Court denies the Plaintiffs' motion for injunctive relief for all these reasons. *See Awad*, 670 F.3d at 1132-33; *RoDa Drilling*, 552 F.23d at 1208.

## II.      Motion to Dismiss (Doc. 12) Under Rules 12(b)(1) and 12(b)(6)

The Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that the Plaintiffs do not have Article III standing to bring their suit. **Doc. 12 at 7.** Defendants also move to dismiss under Rule 12(b)(6) because the Plaintiffs have not stated a claim upon which relief can be granted under the doctrine of consular nonreviewability or RFRA. **Doc. 12 at 11.** In response, the Plaintiffs argue that they have standing to bring this suit and that RFRA supersedes the doctrine of consular nonreviewability. **Doc. 16 at 1.** Even if the doctrine of consular reviewability applies, the Plaintiffs argue that the Court may probe the validity of the consular officer's decision because the decision implicates Calvary Church's constitutional rights under RFRA and because the consular officer acted in bad faith. ***Id.* at 16-17.**

### A.  Legal Standard for Standing

The Constitution allows federal courts to adjudicate only genuine cases and controversies, which require litigants to have standing. *California v. Texas*, 141 S. Ct. 2104, 2113 (2021); U.S. Const. art. III, § 2, cl. 1; *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992); *United States v. Texas*, 143 S. Ct. 1964, 1969 (2023). Because Article III standing is a jurisdictional issue, the trial court must determine whether each plaintiff has standing to bring the case in federal court. *See Felix v. City of Bloomfield*, 841 F.3d 848, 854 (10th Cir. 2016); *Polis*, 20 F.4th at 692. Standing is determined when the legal action is brought, and if a plaintiff does not establish standing, the case must be dismissed for lack of subject matter jurisdiction. *See Nova Health Systems v. Gandy*, 416 F.3d 1149, 1154-1155 (10th Cir. 2005); *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005). Article III standing is "always an antecedent question to the merits,"

so this Court will analyze whether the Plaintiffs have standing before determining the merits of their claims. *Steel Co. v. Citizens*, 523 U.S. 83, 101 (1998).

A plaintiff demonstrates standing by showing (1) he has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that a favorable judicial decision will redress the injury. *Defs. of Wildlife*, 504 U.S. at 559–61. An injury in fact is a concrete and particularized invasion of a plaintiff's legally protected interest. *Id.* at 560. To show causation, the injury must be fairly traceable to the defendant's challenged action and not the result of independent action by another party. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-41 (1976). Third, it must be likely that a favorable decision will redress the injury. *Id.* at 38, 43; *Defs. of Wildlife*, 504 U.S. at 560-561. "Since [standing is] an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561.

In short, a plaintiff must show that they have suffered an injury fairly traceable to the defendant's allegedly unlawful conduct that will likely be redressed by the requested relief. *Haaland v. Brackeen*, 143 S. Ct. 1609, 1638 (2023). If a plaintiff cannot demonstrate all three elements of standing by a preponderance of evidence, Rule 12(b)(1) directs a trial court to dismiss an action for a lack of subject matter jurisdiction. *Defs. of Wildlife*, 504 U.S. at 561. When deciding if plaintiffs have standing at the motion to dismiss stage, the trial court must accept as true all material allegations of the complaint and construe the complaint liberally in favor of the plaintiff. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013); *Warth v. Seldin*, 422 U.S. 490, 501 (1975). A court may also refer to evidence outside the pleadings when determining factual

disputes to subject matter jurisdiction. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (abrogated on other grounds).

**B. Plaintiff Calvary Church has standing to sue Defendant Unknown Consular Officer. All other parties are dismissed from the suit.**

The Defendants first contend that the consular officer refused Mr. Green's visa on two grounds: misrepresentation under § 1182(a)(6)(C)(i) and a failure to overcome the presumption of immigrant status under § 1184(b). **Docs. 12 at 9; 1-2 at 1.** Because the Plaintiffs' complaint focuses on the consular officer's misrepresentation determination, the Defendants assert that § 1184(b) is an independent and unchallenged reason for refusal that removes the Plaintiffs' standing to challenge the decision. *Id.* If the Defendants are correct, a denial based on an independent reason unrelated to the consular officer's misrepresentation finding would render the Plaintiffs without standing. *See Day*, 500 F.3d at 1134; *Wilson*, 98 F.3d at 594; *Fuller*, 86 F.3d at 1027. The record at this stage of litigation is unclear; the Refusal Worksheet Mr. Green received on January 19, 2023, references misrepresentation as the sole reason for refusal, while the LegalNet Advisory confirmed both bases for the denial. **Docs. 16-1; 2-2.** At the motion to dismiss stage, this Court accepts all material allegations in the complaint, including the Plaintiffs' assertion that Mr. Green had overcome his presumption of immigrant status at his second interview in Johannesburg. **See docs 16 at 21;** *Southern Utah Wilderness Alliance*, 707 F.3d at 1152; *Defs. of Wildlife*, 504 U.S. at 561. The Plaintiffs survive this challenge to subject matter jurisdiction. *See id.*; *Seldin*, 422 U.S. at 501; Holt, 46 F.3d at 1003.

Next, the Court turns to whether all Plaintiffs have standing to challenge Mr. Green's visa refusal. *See Nova Health Systems*, 416 F.3d at 1154-55. The Plaintiffs argue that Mr. Green—and Keilah Green and H.P.G. as derivative R-2 applicants under Mr. Green's R-1 visa—have standing to bring this litigation as "persons within the immigration system." **Doc. 16 at 22.** *See O Centro*,

286 F. Supp. 3d at 1259 n.11. As the Court found earlier in this opinion, nonresident aliens may not bring an action under either the Constitution or RFRA. *See Aamer*, F.3d at 1043; *Rasul*, 563 F.3d at 532; *Allaithi*, 753 F.3d at 1334; *Din*, 576 U.S. at 88 (plurality); *Mandel*, 408 U.S. at 762; *Agency for Int'l Dev.*, 140 S. Ct. at 2086. The consular officer's refusal, while having the practical effect of denying the Green family entrance into the United States, did not invade any legally protected right they possessed under RFRA. *See Defs. Of Wildlife*, 504 U.S. at 560; *Rasul*, 563 F.3d at 532; *Allaithi*, 753 F.3d at 1334. Therefore, the Court dismisses Plaintiffs Stefan Green, Keilah Green, and H.P.G. from this lawsuit for lack of standing because they did not suffer an injury-in-fact. *See Steel Co.*, 523 U.S. at 101. The remaining Plaintiff, Calvary Church, did suffer a concrete and particularized injury because Defendant Unknown Consular Officer's visa refusal denied them their choice of worship minister, and a favorable decision by this Court would likely redress their injury. *See Brackeen*, 143 S. Ct. at 1638.

The Defendants then challenge the Plaintiffs' standing to sue Defendants without visa power. **Doc. 12 at 9.** Plaintiffs have filed suit against Anthony Blinken in his official capacity as United States Secretary of State, the United States Department of State, the Office of the Legal Adviser for Consular Affairs (also known as the Visa Office or LegalNet), the U.S. Consulates in Johannesburg and Cape Town, and Unknown Consular Officer. **See Doc. 1 at 8.** This Court agrees that all Defendants except the Unknown Consular Officer must be dismissed from these proceedings because Plaintiff Calvary Church has not demonstrated that these Defendants caused the visa denial or could redress the injury. *See Defs. Of Wildlife*, 504 U.S. at 560-62.

The INA vests the power to grant or deny a visa exclusively to consular officers, even expressly precluding review of visa refusals by the Secretary of State. *See, e.g., Saavedra Bruno*, 197 F.3d at 1156; *Baan Rao Thai*, 985 F.3d at 1025; 8 U.S.C. § 1104(a) ("The Secretary of State

shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality relating to (1) the power, duties, and functions of diplomatic and consular officers of the United States, *except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas*…") (emphasis added); 22 C.F.R. § 41.21(a). Only consular supervisors or a designated alternate may review nonimmigrant visa refusals; if a reviewing officer disagrees with the decision and has a consular commission and title, they may assume responsibility for the case and adjudicate the visa decision. 22 C.F.R. § 41.121(c). If the reviewing officer does not have a consular commission and title, disagreements must be resolved by consulting with the deciding consular officer. *Id.* The State Department may also review nonimmigrant visa refusals and provide advisory opinions to the consular officers; consular officers are bound by State Department rulings on legal interpretations but not on applications of the law to the facts of the case. 22 C.F.R. § 41.121(d).

The Plaintiffs allege that all Defendants are charged with issuing visas or providing legal opinions to consulates regarding visa issuance. **See doc. 1 at 8**. However, of the Defendants named in the suit, the Unknown Consular Officer is the only person responsible for denying Mr. Green's visa and the only named Defendant who can reconsider the denial. *See* 8 U.S.C. § 1104(a); 8 U.S.C. § 1201(a)(1); 8 U.S.C. § 1201(g); 8 U.S.C. § 136; 22 C.F.R. § 41.121(c)-(d). Because Secretary of State Blinken is statutorily barred from interfering with a consular officer's decision to refuse a visa, and there is no evidence in the record of his involvement in this visa refusal, the Plaintiffs have not shown that Secretary of State Blinken caused the injury or has the power to redress the visa denial. *See* 8 U.S.C. § 1104(a); *E. Ky. Welfare*, 426 U.S. at 41-41; *Defs. Of Wildlife*, 504 U.S. at 560-561.

While the State Department may bind a consular officer on interpretations of law, Mr. Green's visa denial was based on the consular officer's factual finding that Mr. Green made a material misrepresentation. ***See* doc. 1-2 at 1** ("We have reviewed the finding and found no legal error in this determination of ineligibility based on the facts available. Whether or not your client made a material misrepresentation is a factual determination that only a consular office can decide, and in this case did decide."); 22 C.F.R. § 41.121(c)-(d). Because the denial was based on a consular officer's application of law to the facts of the case and not a legal interpretation of the misrepresentation standard under § 212(a)(6)(C)(i), the State Department did not cause the refusal and cannot redress the injury. *See* 22 C.F.R. § 41.121(c)-(d); *E. Ky. Welfare*, 426 U.S. at 41-42; *Defs. of Wildlife*, 504 U.S. at 560-561.

The Plaintiffs also have not pleaded facts to suggest that the visa refusal was fairly traceable to any action taken by the Office of the Legal Adviser. *See E. Ky. Welfare*, 426 U.S. at 41-42. The Plaintiffs assert in their complaint that the Office of the Legal Adviser "determined" that Mr. Green engaged in unauthorized employment and misinterpreted the 90-day rule in the Foreign Affairs Manual. **Doc. 1 at 3, 18.** Based on the record, however, it appears that the Office of the Legal Adviser became involved in this matter only after Plaintiffs' counsel inquired about the basis of Mr. Green's visa denial. ***See* docs. 1 at 17** ("The Office of the Legal Adviser for Consular Affairs provided additional information to counsel regarding the visa denial noticing that the consular officer applied the "90-day rule" in Mr. Green's case …"**); 1-2 at 1.** Because the denial was based on a consular officer's application of law to the facts of the case and not any binding legal interpretation of the Foreign Affairs Manual or the INA provided to the consular officer by the Office of the Legal Adviser, the Plaintiffs have not shown either causation or redressability for

Defendant Office of the Legal Adviser. *See* **doc. 1-2 at 1**; 22 C.F.R. § 41.121(c)-(d); *E. Ky. Welfare*, 426 U.S. at 41-41; *Defs. of Wildlife*, 504 U.S. at 560-561.

The Plaintiffs have likewise failed to show that their injury is fairly traceable to the United States Consulates in Cape Town and Johannesburg. *See E. Ky. Welfare*, 426 U.S. at 41-42. While it is true that the consular officers responsible for Mr. Green's visa denials were employed out of the Cape Town and Johannesburg consulates, only consular officers—not the consulate itself—can grant or deny visas. *See* **doc. 1 at 8**; 8 U.S.C. § 1201(a)(1); 8 U.S.C. § 1201(g); 8 U.S.C. § 136. Further, Mr. Green re-filed his visa application after his initial denial by the Cape Town consular officer and scheduled an interview with the consulate in Johannesburg. **Doc. 1 at 16.** The Cape Town consulate never made a finding of misrepresentation in Mr. Green's case and has no authority or ability to redress any factual finding of misrepresentation made by a Johannesburg consular officer. *See* **doc. 1-2** (LegalNet advisory opinion informs Plaintiffs' counsel that they may present additional evidence related to the misrepresentation denial to the U.S. Consulate in Johannesburg).

The Plaintiffs repeatedly attribute the Unknown Consular Officer's actions to the Johannesburg consulate in their complaint. **See doc. 1 at 3-4** ("The Johannesburg Consulate applied the so-called "90-day rule…"; "The Johannesburg Consulate never verbally warned Mr. Green …"; "the Johannesburg consulate refused to grant him an R-1 visa…"). But only a consular officer can take these actions under the INA and Foreign Affairs Manual. *See* 8 U.S.C. § 1201(a)(1); 8 U.S.C. § 1201(g); 8 U.S.C. § 1361; 9 FAM § 302.9- 4(B)(3)(g)(2)(U)(b); 302.9-4(B)(3)(f)(1)(U); 302.9-4(B)(6)(b)(U). The Plaintiffs make no arguments challenging how the consulate reviewed the Unknown Consular Officer's decision to deny Mr. Green's visa. *See* 22 C.F.R. § 41.121(c)-(d). Therefore, the Plaintiffs have not demonstrated that the Johannesburg

consulate took any action that was fairly traceable to the Unknown Consular Officer's denial of Mr. Green's visa, and they have not shown how the Johannesburg consulate would have the power to redress the visa refusal. *E. Ky. Welfare*, 426 U.S. at 41-41; *Defs. of Wildlife*, 504 U.S. at 560-561.

The Court, therefore, dismisses as defendants Anthony Blinken in his official capacity as Secretary of State, the Department of State, the Office of the Legal Adviser for Consular Affairs, and the U.S. Consulates in Johannesburg and Cape Town. By statute, these defendants are not empowered to grant or deny visas and do not meet the causation and redressability requirements of Article III standing.[12] *See E. Ky. Welfare*, 426 U.S. at 41-41; *Defs. of Wildlife*, 504 U.S. at 560-561; 8 U.S.C. § 1104(a); 8 U.S.C. § 1201(a)(1); 8 U.S.C. § 1201(g); 8 U.S.C. § 136. The Unknown Consular Officer is the only remaining Defendant.

## C.  Legal Standard for Motions to Dismiss under Rule 12(b)(6)

Rule 12(b)(6) directs the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must include sufficient facts that, if true, state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Mink v. Knox*, 613 F.3d 995, 1000 (10th

---

[12] The Plaintiffs argue that district courts across the country have allowed as named defendants the Department of State, the Secretary of State, the consulate tasked with processing the visa, the consulate's ambassador, and consular officers. **See doc. 16 at 23-24.** Their arguments are not persuasive for two reasons. First, the defendants in those cases did not challenge these agencies or subagencies as defendants. **Doc. 21 at 3-4.** Second, the cited cases challenge visa refusals <u>and</u> consular delays in processing visa applications. *See doc. 16 at 23-24.* Unlike visa refusals, which are in consular officers' sole purview, the time it takes to process a visa implicates State Department officials, consulates, and ambassadors. The cited cases dismiss Defendants from USCIS and the Department of Homeland Security but retain Department of State defendants (including individuals named in their official capacities and subsidiary agencies) as responsible parties for the delays in visa adjudication. *See, e.g., Alshawy v. USCIS*, 2022 WL 970883 (D.D.C. Mar. 30, 2022) (Plaintiff challenged both visa denial and the United States Embassy in Qatar's two-year delay in processing her visa); *Logan v. Blinken*, 2022 WL 3715798 (D.D.C. Aug. 29, 2022) (Plaintiff challenged a yearlong delay in scheduling an interview with the visa applicant by the United States consulate in Ghana); *Ayno v. Blinken*, 2022 WL 4598513 (D.D.C. Sept. 30, 2022) (challenging a three-year long delay by the National Visa Center in processing a visa application); *Whitlock v. Dep't Homeland Security*, 2022 WL 424983 (D.D.C. Feb. 11, 2022) (challenging both the adjudication of the plaintiff's fiancé-visa and delays in that adjudication stemming from COVID closures).

Cir. 2010). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Therefore, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). All well-pleaded factual allegations are "viewed in the light most favorable to the nonmoving party." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014).

In ruling on a motion to dismiss, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The Court must draw all reasonable inferences in Plaintiff's favor. *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007). However, mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. "[T]o state a claim in federal court, a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and what specific legal right the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents, at Cnty. Just. Ctr.*, 492 F.3d 1158, 1163 (10th Cir. 2007).

### D.  The Plaintiffs have not stated a claim upon which relief can be granted under the doctrine of consular nonreviewability and RFRA.

The Court now turns to whether the remaining Plaintiff, Calvary Church, has stated a claim upon which relief can be granted against Defendant Unknown Consular Officer. *See* Fed. R. Civ. P. 12(b)(6). As described earlier in the opinion, this Court finds that the doctrine of consular nonreviewability prevents this Court from reviewing the consular officer's decision under RFRA, the APA, and the DJA. Therefore, Calvary Church has not stated a claim upon which relief can be granted, and accordingly, the Court grants the Defendants' motion to dismiss under Rule 12(b)(6).

RFRA applies broadly to all federal laws, but the doctrine of consular nonreviewability is judicially created and does not derive from any federal statute. *See Hobby Lobby Stores*, 723 F.3d at 1128; *Allen*, 896 F.3d at 1101; *Del Valle*, 16 F.4th at 838; 42 U.S.C. § 2000bb-1(c). Therefore, RFRA's "broad protections for religious liberty" do not extend to long-standing judicial presumptions and standards of review like the doctrine of consular nonreviewability. *See Ajaj*, 25 F.4th at 813-16; *Tanzin*, 141 S. Ct. at 491; *Hobby Lobby Stores*, 723 F.3d at 1128; 42 U.S.C. § 2000bb-1(c). As an initial matter, the Plaintiffs have not shown that this Court may ignore the doctrine of consular nonreviewability to substantively review visa refusals that implicate religious freedoms. ***See doc. 16 at 8***; *Hawaii*, 138 S. Ct. at 2418.

Under the doctrine of consular nonreviewability, this Court may only look past the discretion of a consular officer's decision when the visa refusal implicates the constitutional rights of an American citizen. *See Hawaii*, 138 S. Ct. at 2149; *Allen*, 869 F.3d at 1097. Because RFRA is "analogous to a constitutional right" in the Tenth Circuit, this Court examines whether the consular officer provided a facially legitimate and bona fide reason for denying the visa. *See Hobby Lobby Stores*, 723 F.3d at 1146; *Mandel*, 408 U.S. at 770; *Baaghil*, 1 F.4th at 432. Here, the consular officer cited an individualized facially legitimate reason for the visa denial—misrepresentation under 8 U.S.C. § 212(a)(6)(C)(1)—and made plausible factual findings to support his determination. ***See docs. 1-2; 16-2***; *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment); *Yafai*, 912 F.3d at 1020; *Hawaii*, 138 S. Ct. at 2419; *Marczak*, 971 F.2d at 517-518. Absent the Plaintiffs affirmatively showing that the visa refusal was made in bad faith, this Court is prevented from looking behind the consular officer's decision for additional factual details. *Din*, 576 U.S. at 105 (Kennedy, J. concurring in judgment).

39

Next, the Plaintiffs allege that the consular officer acted in bad faith by refusing to follow the Foreign Affairs Manual guidelines on the 90-day rule, incorrectly determining that Mr. Green had engaged in unauthorized employment, and failing to consider the evidence presented to the Plaintiffs. **Doc. 1 at 17.** However, even if the Court presumes all factual allegations in the complaint to be true, the Plaintiffs have not affirmatively demonstrated that the consular officer acted in bad faith. *See Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment); *Khachatryan*, 4 F.4th at 852-53; *Yafai*, 912 F.3d at 1022; *Sesay*, 984 F.3d at 316-17; *Kay*, 500 F.3d at 1217. The Plaintiffs have not alleged any subjective bad faith on the officer's part, nor was the officer's conclusion that Mr. Green intended to engage in employment as an independent contractor objectively unreasonable, given Mr. Green's testimony about payments he received from Calvary Church. ***See* doc. 1 at 16-17; 16 at 17-20.** The Plaintiffs state that over three interviews with consular officers, Mr. Green produced "a packet of information from his attorney…that explained the honoraria/allowances that Mr. Green received before R-1 approval…Mr. Green's prior attorney submitted proof of Mr. Green's payments to the consulate." **Doc. 1 at 16**.

Accepting as true the Plaintiffs' assertion that Mr. Green never engaged in unauthorized employment in the United States, the test for bad faith is whether it was objectively unreasonable for the consular officer to decide otherwise. ***See* doc. 1 at 18**; *Yafai*, 912 F.3d at 1022; *Sesay*, 984 F.3d at 316-17; *Kay*, 500 F.3d at 1217. There is no indication that the consular officer's misrepresentation determination was not based on an honest assessment of Mr. Green's testimony and documentation. ***See* doc. 1 at 16-18; 16 at 17-18**; *Yafai*, 912 F.3d at 1022; *Khachatryan*, 4 F.4th at 853-54; *Sesay*, 984 F.3d at 316-17; *Twombly*, 550 U.S. at 555. Because the Plaintiffs failed to affirmatively show bad faith, this Court is barred from judicially reviewing the merits of the

visa refusal. *See* Fed. R. Civ. P. 12(b)(6); *Din*, 576 U.S. at 105 (Kennedy, J., concurring in judgment).

The Plaintiffs have also failed to state a claim upon which relief can be granted under the APA. The APA's judicial review provisions provide "a strong presumption that Congress intends judicial review of administrative action" and allow a court to overturn agency actions that are arbitrary, capricious, or exceed the agency's statutory authority. *See Allen*, 896 F.3d at 1103; *Bowen v. Mich. Acad. Of Family Physicians*, 476 U.S. 667, 670 (1986); 5 U.S.C. § 706(2)(A)-(C). However, the APA limits judicial review where there are pre-existing limitations on judicial review or where Congress has committed a particular agency action to the agency's discretion. 5 U.S.C. § 701(a)(1)-(2); § 702. Here, the doctrine of consular nonreviewability acts as a "limitation on judicial review" pre-dating the passage of the APA, that confines this Court's ability to review individual visa determinations on the merits.[13] *See 5* U.S.C. § 702; *Allen*, 896 F.3d at 1108-9; *Baaghil*, 1 F.4th at 434-35. Additionally, the decision to grant or deny a visa is delegated exclusively to consular officers under the INA, making these decisions discretionary agency actions not subject to judicial review. 5 U.S.C. § 701(a)(1)-(2); *Saavedra Bruno*, 197 F.3d at 1160; *Morfin*, 851 F.3d at 712; *Baaghil*, 1 F.4th at 434-35. *See, e.g.,* 8 U.S.C. § 1104(a); 8 U.S.C. § 1201(a)(1); 8 U.S.C. § 1201(g). Therefore, the doctrine of consular nonreviewability precludes the Plaintiffs from stating a claim upon which relief may be granted under the APA. *See Saavedra Bruno*, 197 F.3d at 1160; *Morfin*, 851 F.3d at 712; *Baaghil*, 1 F.4th at 434-35.

---

[13] *See also Saavedra Bruno*, 197 F. 3d at 1156-1156 ("[w]e may infer that the immigration laws preclude judicial review of consular visa decisions. There was no reason for Congress to say as much expressly. Given the historical background against which it has legislated over the years, … Congress could safely assume that aliens residing abroad were barred from challenging consular decisions in federal court unless legislation specially permitted such actions. The presumption, in other words, is the opposite of what the APA normally supposes.")

This Court also declines to exercise its discretion to determine parties' legal rights under the DJA. *Kunkel,* 866 F.2d at 1273; *Aetna Life Ins.*, 300 U.S. at 240; *Ala. State Fed'n of Labor*, 325 U.S. at 462. Because there is generally no "judicially remediable right" under the doctrine of consular nonreviewability for challenging visa refusals, the Plaintiffs cannot find substantive relief under the DJA. *See* 28 U.S.C. § 2201(a); 28 U.S.C. § 2201(a); *Schilling*, 363 U.S. at 677. Determining the parties' rights would require this Court to look behind the consular officer's decision to deny Mr. Green's visa denial, a direct violation of the doctrine of consular nonreviewability. *See Matsushkina*, 877 F.3d at 295-96; *Baan Rao Thai*, 985 F.3d at 1025; *Schilling*, 363 U.S. at 677. Therefore, the doctrine of consular nonreviewability limits the Plaintiffs' ability to state a claim upon which relief may be granted under the DJA. *See* 28 U.S.C. § 2201(a); 28 U.S.C. § 2201(a); *Schilling*, 363 U.S. at 677.

Even if the doctrine of consular nonreviewability did not prohibit the Plaintiffs' RFRA, APA, and DJA claims, Calvary Church has not stated a *prima facie* RFRA claim upon which relief can be granted. *See Gonzales*, 546 U.S. at 428; *Tanzin*, 141 S. Ct. at 489; 42 U.S.C. § 2000bb; *Iqbal*, 556 U.S. at 678. To make a *prima facie* RFRA claim, Calvary Church must show that a government action—here, Defendant Unknown Consular Officer's denial of Mr. Green's visa application under the INA's misrepresentation statute—substantially burdens Calvary Church's exercise of a sincere religious belief. *See Gonzales*, 546 U.S. at 428.

Calvary Church has satisfactorily demonstrated that its beliefs around minister compensation are sincere and rooted in its specific religious practice. ***See* docs. 2-2** (affidavit detailing Calvary Church's belief that they must compensate ministers comes from 1 Corinthians 9:14, Galatians 6:6, 1 Timothy 5:17-18; Luke 10:7; 2 Corinthians 11:7-9; Philippians 4:16-19); *Gonzales*, 546 U.S. at 428; *Thomas*, 450 U.S. at 716; *Burwell*, 573 U.S. at 725; *Abdulsaheeb*, 600

F.3d at 1314. Calvary Church argues that the visa denial is a substantial burden that prevents it from inviting foreign-born ministers to the church because it cannot compensate these invited ministers as required by its religious beliefs. *See* **docs. 16 at 14** ("In essence, Calvary can never invite a foreign-born minister to minister at Calvary on a B-1/B-2 visa without violating its beliefs."); **1 at 3, 15; 16 at 22-23;** *Hobby Lobby Stores*, 723 F.3d at 1137-38.

With all reasonable inferences drawn in its favor, Calvary Church has not plead any factual content that allows this Court to infer that the Unknown Consular Officer's decision substantially burdened its sincere expression of religion. *See Iqbal*, 556 U.S. at 678; *Bemis*, 500 F.3d at 1217. Calvary Church claims that the visa denial represents a government position that "makes it impossible for any religious organization to have an itinerant minister conduct permissible B1/B2 activities as a religious worker within the first 90 days of entry on a B1/B2 visa." **Doc. 1 at 4.** Outside of this conclusory allegation, however, Calvary Church has not demonstrated how one consular officer's factual finding of misrepresentation represents a "troubling position which has implications on religious freedoms in the entire United States." ***See* doc. 1 at 4,** *Kansas Penn Gaming*, 656 F.3d at 1214; *Bemis*, 500 F.3d at 1217. Indeed, Calvary Church's *prima facie* RFRA claim fails because it has not shown that the consular officer's decision requires it to change its minister compensation practices, prevents it from compensating ministers in the future, or substantially pressures it to act contrarily to its sincerely held beliefs about minister compensation. *See Hobby Lobby Stores*, 723 F.3d at 1138; *Abdulsaheeb*, 600 F.3d at 1315; *Lee*, 455 U.S. at 254; *Kansas Penn Gaming*, 656 F.3d at 1214; *Nasious*, 492 F.3d at 1163; *Twombly*, 550 U.S. at 555.

The consular officer's visa refusal was centered on his finding that Mr. Green materially misrepresented the purpose of his April 09, 2022, trip to the United States to a border official as commensurate with a B-1/B-2 visa and then engaged in unauthorized employment activities as an

independent contractor. **Doc. 1-2 at 1**. Contrary to the Plaintiffs' assertions that Mr. Green's visa was denied "because Calvary *exercised* its belief that Mr. Green, as an itinerant minister, should be given honoraria/allowances, and denied his visa solely due to the payments made," the facts alleged in the complaint support the notion that the visa refusal was based on Mr. Green's misrepresentation, not any conduct by Calvary Church. ***See* docs. 16 at 14 (emphasis in original); 1-2; 16-1; 16-2**. In fact, Calvary Church is not mentioned in the various notices regarding Mr. Green's visa denial. ***See generally* docs. 1-2; 16-1; 16-2.**

Accordingly, the Plaintiffs have not shown that the Defendants ordered Calvary Church to change its conduct or that Calvary Church's religious beliefs played any role in the consular officer's refusal. ***See id; Hobby Lobby Stores*, 723 F.3d at 1138.** Rather, the decision was based solely on Mr. Green's conduct—his representations to the border official—and the consular officer's finding that Mr. Green intended to engage in unauthorized employment conduct. ***See id.*** The consular officer's decision does not otherwise limit Calvary Church from inviting foreign-born itinerant worship leaders to minister at their church or compensating them as required by their sincere religious belief. ***See* doc. 1-2**; *Hobby Lobby Stores*, 723 F.3d at 1138.

Finally, Calvary Church argues that the consular officer's decision interferes with its decisions of internal church governance, including its choice of who to hire as its Worship Director. **Doc. 1 at 2, 10.** Courts are prohibited from reviewing internal church disputes involving matters of faith, doctrine, church governance, and polity. *Bryce v. Episcopal Church in the Diocese of Co.*, 289 F.3d 648, 655 (10th Cir. 2002). While religious institutions do not have general immunity from secular laws, the autonomy of religious groups concerning internal management decisions—including the selection of individuals who play critical roles in the group—is protected. *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1029 (10th Cir. 2022); *Our Lady of Guadalupe*

*Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Accordingly, courts have acknowledged that religious organizations have affirmative defenses to lawsuits that interfere in "matters of church government" under the church autonomy doctrine and the ministerial exception. *See Hosanna-Tabor.*, 565 U.S. at186; *Tucker*, 36 F.4th at 1029 ("Like the church autonomy doctrine, the ministerial exception operates as an affirmative defense to an otherwise cognizable claim.").

The Plaintiffs argue that a "religious organization's choice of a particular minister or religious worker is per se religious exercise" and therefore protected under RFRA. ***See* doc. 1 at 10**; *Hosanna-Tabor*, 565 U.S. at 181. However, the protections cited by the Plaintiffs for a church's exercise of its religious beliefs most commonly come in the form of affirmative defenses available to religious organizations accused of wrongdoing. ***See* doc. 1 at 1, 10-11.** Courts have allowed these affirmative defenses in claims by employees of religious groups asserting civil rights, employment discrimination, and Americans with Disabilities Act claims. *See generally Hosanna-Tabor*, 565 U.S. at 171; *Tucker*, 36 F.4th at 1021; *Our Lady*, 140 S. Ct. 2049; *Bryce*, 289 F.3d at 648.

These affirmative defenses, however, do not restrict the government from imposing neutral immigration rules that may limit the pool of available potential religious hires. *See Hosanna-Tabor*, 565 U.S. at 188, 195-196 (expressing no view on whether the ministerial exception applies to hiring "aliens not authorized to work in the United States"); *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060; *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017). Here, the consular officer's decision does not interfere with Calvary Church's hiring decision by pressuring it to hire or fire a particular employee or requiring a candidate to have specific qualifications. *Hosanna-Tabor*, 565 U.S. at 171; *Gonzales v. Roman Catholic Archbishop*, 280 U.S. 1, 16 (1929). Therefore, Plaintiff Calvary Church has not pleaded adequate factual content to

allow this Court to infer that the Defendant Unknown Consular Officer interfered in its internal court government. *See Hosanna-Tabor*, 565 U.S. at 186; *Iqbal*, 556 U.S. at 678; Twombly, 550 U.S. at 555.

Because Calvary Church has not made a *prima facie* RFRA claim, this Court does not examine whether the Defendants have demonstrated that the burden is the least restrictive means of advancing a compelling government interest. *See Gonzales*, 546 U.S. at 428-430; *Hobby Lobby*, 723 F.3d at 1143. For all the reasons above, this Court grants the Defendants Motion to Dismiss because the Plaintiffs have failed to state a claim upon which relief can be granted under both the doctrine of consular nonreviewability and RFRA. ***See* doc. 12.**

**CONCLUSION**

For the reasons above, the Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunctive Relief (**Doc. 2**) is **DENIED**. The Defendant's Motion to Dismiss Under Rule 12(b)(1) and 12(b)(6) (**Doc. 12**) is **GRANTED**. Finally, the Plaintiffs' Complaint (**Doc. 1**) is **DISMISSED** with prejudice.

**IT IS SO ORDERED**.

_____/s/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE